CASE 2—PETITIONS EQUITY—DECEMBER 9.

# Higgins v. Prater, Sheriff.

APPEAL FROM MAGOFFIN CIRCUIT COURT.

# Hill v. Hamilton, Sheriff.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1. THE AGRICULTURAL AND MECHANICAL COLLEGE OF KENTUCKY furnishes something more than a common school education, and, therefore, does not constitute a part of the common school system of the State.
2. CONSTITUTIONAL LAW—TAXATION IN AID OF OTHER THAN COMMON SCHOOLS.—The Constitution of Kentucky does not require that all money raised by the State by taxation, for educational purposes, shall be applied to the support of the common schools. Therefore, the

Legislature may impose a tax in aid of an educational institution, although it does not form a part of the common school system.

3. CONSTRUCTION OF CONSTITUTION.—Where the words of a particular provision of a Constitution leave the meaning in doubt, the courts will look to its history, the mischief intended to be remedied, and the practical construction which has been given to it in order to arrive at the intention.

4. THE DEBATES OF A CONSTITUTIONAL CONVENTION ARE NOT CONCLUSIVE OF THE MEANING OF THE CONSTITUTION, but it is proper to examine them in order to ascertain the purpose sought to be accomplished by a particular provision where the language of the Constitution leaves the meaning in doubt.

W. LINDSAY, ALEX. P. HUMPHREY FOR APPELLANT.

So much of the act of 1880 as provides for the imposition of a tax of one-half of one cent on each one hundred dollars' worth of taxable property owned by the tax-payers of the State is in conflict with the provisions of section 1, article 11, of the Constitution.

The Constitution was intended to take from the Legislature the power to use any portion of any public fund raised by the State for the purposes of eduation, by taxation or otherwise, for the support or maintenance of any institution of learning other than a common school conducted as part of the general system of common schools. (Legislative Documents 1847-8, pages 567-8; Legislative Reports 1848-9, pages, 557, 558; Session Acts 1847-8, p. 485; Debates of Convention, pages 377, 889, 895, 913; Cooley on Taxation, pp. 88-89; Legislative Reports 1851-52, p. 111; Slack's case, 13 B. M., pages 11-17; Collins v. Henderson, 11 Bush, 83.)

As to rules for construing statutes and Constitutions, see Everett v. Wells, 2 Scott, N. S., 531; Laymon v. Eiffe, 3 Q. B., 910; Newell v. People, 3 Selden, 97; People v. Draper, 15 N. Y., 543; Bidwell v. Whittaker, 1 Mich., 469; Sedgwick on Con. & Stat. Law, p. 208.)

YOUNG & TRABUE ON SAME SIDE.

1. The tax complained of is not raised to maintain a "common school" nor one of a "system of common schools," nor is it "in aid of common schools" within the meaning of the Constitution. (Collins v. Henderson, 11 Bush, 74; Halbert v. Sparks, 9 Bush, 59.)

2. Any sum raised by the Legislature for the "purposes of education" must be appropriated in aid of common schools. It is not merely sums raised for the purposes of common school education that are to be thus appropriated. (Constitution of Kentucky, article 11, section 1.)

When the words of the Constitution are not ambiguous, and involve no absurdity, that which the words declare is the meaning of the instrument, and neither courts nor Legislatures have a right to add to

or take away from the meaning.    (Cooley's Con. Lim., 55; Bidwell v. Whittaker, 1 Mich., 496.)

The debates of the Constitutional Convention can not be considered to vary the terms of the Constitution itself.

3. As the teaching of the inmates of asylums, penitentiaries, &c., is merely incidental, these institutions would not be endangered by the construction of the Constitution, for which appellant contends.

The provision for a legitimate and constitutional purpose does not fail, because, in carrying it out, some incidental purpose may be effected which could not be done were it independent of and not incidental to the principal and legitimate purpose.    (Mills on Eminent Domain, sec. 13; *Idem*, sec. 22; Cottrell v. Myrick, 12 Me., 233.)

A. H. HOWARD of counsel on same side.

W. C. P. BRECKINRIDGE, TEMPLE BODLEY, HENRY S. BARKER for appellees.

1. Article XI of the Constitution relates only to sums raised for purposes of *common school* education, and not to those for higher education, and, therefore, does not forbid State aid to higher education. (Debates of Constitutional Convention.)

As to rules for construing statutes and Constitutions, see Broom's Maxims, 481; 54 N. Y., 332; 4 Const., 140; People v. Utica Ins. Co., 15 John.; Mason v. Rogers, 4 Litt., 377; Philips v. Pope's Heirs, 10 B. M., 172-3; 8 Bush, 455; 10 Bush, 612-13; Sedgwick on Constitutional Construction, Pomeroy's note, page 227; Leavenworth v. Miller, 7 Kans., 479.)

In the distribution of the powers of government, the Constitution conferred upon the Legislature the general legislative power of the State, and this power is not to be deemed restricted unless by the clearest language of the Constitution.    (Cooley's Con. Lim., p. 159.)

2. If the State College is part of "a system of common schools," any sum raised in aid of it by taxation or otherwise is lawfully raised.    That it is part of the common schools is *literally* true.

CHIEF JUSTICE HOLT delivered the opinion of the court

The question presented in these cases is not only an important, but a delicate one.    Delicate, because we must determine whether a legislative act is constitutional; and important, because it relates to education, which has been said to be the birthright of every child born in a republic.    Its consideration has been delayed

because of repeated legislative agitation upon the subject; but, as a convention is now in session, framing a proposed organic law for the State, it is proper that it should be decided.

Our Legislature, in 1880, passed a statute imposing a tax of one-half a cent on each one hundred dollars in value of taxable property in the State for that year, and for each subsequent year, for the benefit of the Agricultural and Mechanical College of Kentucky, which is an educational institution incorporated by the law of the State, and under its control. The tax is a small one. The owner of ten thousand dollars' worth of property pays but fifty cents a year. If unconstitutional, however, then it is oppression, however small. The tax upon the British tea which was thrown overboard in Boston harbor was but three pence per pound. It is urged that it is so, under article 11 of our Constitution, which provides:

"The capital of the fund called and known as the 'Common School Fund,' consisting of one million two hundred and twenty-five thousand seven hundred and sixty-eight dollars and forty-two cents, for which bonds have been executed by the State to the Board of Education, and seventy-three thousand five hundred dollars of stock in the Bank of Kentucky; also the sum of fifty-one thousand two hundred and twenty-three dollars and twenty-nine cents, balance of interest on the school fund for the year 1848, unexpended, together with any sum which may hereafter be raised in the State by taxation or otherwise, for purposes of education, shall be held inviolate for the purpose of sustaining a system of common schools. The in-

terest and dividends of said funds, together with any sum which may be produced for that purpose by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose. The General Assembly shall invest said fifty-one thousand two hundred and twenty-three dollars and twenty-nine cents in some safe and profitable manner; and any portion of the interest and dividends of said school fund, or other money or property raised for school purposes which may not be needed in sustaining common schools, shall be invested in like manner. The General Assembly shall make provision by law for the payment of the interest of said school fund: *Provided*, That each county shall be entitled to its proportion of the income of said fund, and if not called for for common school purposes, it shall be reinvested from time to time for the benefit of such county.''

If the college can fairly be considered a part of our common school system, then this is an end of the controversy. It is unsectarian in character. Its design is to furnish at a cheap rate of tuition a practical and liberal education to the rich and poor alike; a place for the education of the boy of the millionaire, the mechanic and the farmer; one where the children of the mass of our people, whether they come from the mountains or the valleys, can prepare themselves for proper citizenship. It has a normal department, and is subject to the control of a State Board of Trustees. Each legislative district of the State can send one student per year, who may take the entire collegiate course free of charge for tuition; and it may in like manner send for one year not more than

four persons, in the discretion of the board of control, who are, or intend to be, teachers.

Notwithstanding all this, however, we think it clear, in the light of the proceedings of the convention which framed our Constitution, and legislation prior and subsequent thereto, as well as from the opinions of this court in the case of Halbert v. Sparks, 9 Bush, 259, and Collins v. Henderson, &c., 11 Bush, 74, that this institution can not be regarded as a part of our common school system. In fact, this is virtually conceded in argument. This tax was, therefore, not levied in aid of the common school system.

And this brings us to the consideration of the highly important question, which is *res integra*, whether the Legislature can constitutionally aid by taxation any educational institution whatever, other than common schools. It is plain that it is not expressly forbidden by the article of the Constitution above cited. An implied prohibition is, however, claimed. Any doubt as to the constitutionality of the statute must be resolved in its favor by the courts; and while a Legislature ought not to exercise a doubtful power, yet, if it has done so, and it be claimed that the power is constitutionally denied to it by implication, then such implication should be clear, inasmuch as in its absence, in a case like this one, the Legislature has full power over the subject. It is urged that the words, "together with any sum which may be hereafter raised in the State, by taxation or otherwise, *for purposes of education*, shall be held inviolate, for the purpose of sustaining a system of common schools," are so plain that there is no

room for construction. In other words, that the organic law has confined the use of any money raised by taxation to the support of common schools. In determining this question, this court can not consider whether the result may cripple rival institutions, or possibly affect the future prosperity of our common school system. These are matters of expediency that address themselves to the law-maker, and not to the courts. If the words of a statute or a Constitution be within themselves perfectly plain as to the purpose of the maker, then they must be followed by the courts. The true intention of the provision is to be ascertained. In doing so, we look first to the words. If they clearly express *the thought*, and there be no ambiguity, then there is nothing left for construction. They are in such a case to be accepted literally, because, by doing so, the spirit of the law is ascertained. In such a case the courts can not add to or take away by construction. If, however, after considering the language, doubt remains as to the purpose of the law, then courts may resort to extrinsic aids to ascertain it, such as the purpose that was in view, or the mischief to be remedied; and in case of a constitutional provision, to the proceedings of the convention that framed it. Even the penal statutes, which are to be construed strictly, are not to be construed so far in that direction as to defeat the purpose of their enactment. It seems evident to us that the words of this constitutional provision are not beyond the need of construction. It says: "Together with any sum which may be hereafter raised in the State, by taxation *or otherwise*, for purposes of education, shall be held in-

violate for the purpose of sustaining a system of common schools." This language, taken literally, includes every dollar raised in the State for purposes of education, whether by taxation, private subscription or donation. Evidently, however, the intention was to include only *public* money raised by *public* authority for public education.

Again, it was decided by this court in Auditor v. Holland, &c., 14 Bush, 147, that the Legislature could not abdicate its authority over the common school fund, made sacred for that purpose by the Constitution, in favor of any authority; and that the common school system must be uniform and common to the whole State. Now, local school taxation is by the authority of the State, and for "purposes of education." It falls within the letter of this article of the Constitution. But evidently it was not intended to prevent it; and the article, properly construed, refers to money raised by the State for the purposes of general public education. Thus we see the entire article can not be taken literally. The term "school fund" occurs several times in it, and undoubtedly means common school fund. Are the words "purposes of education" to be taken literally, then, and construed to mean that all public money raised for any and all educational purposes must become a part of the common school fund? In other words, does the Constitution impliedly forbid the raising of any public money by taxation for any educational purposes, save the general common school fund of the State? Common school education is the subject of the article. No other sort of education is named, and the very next clause after the words, "to-

gether with any sum which may be hereafter raised in the State, by taxation or otherwise, for purposes of education, shall be held inviolate for the purpose of sustaining a system of common schools" is: "The interest and dividends of said funds, together with any sum which may be produced for *that* purpose by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose." What is the meaning of the words "together with any sum which may be produced for *that* purpose by taxation or otherwise," unless it be a sum produced by taxation for the purpose of supporting the common schools? "*That purpose*" means a single purpose, already in the mind of the reader. The only single purpose in contemplation is common school education, and it, therefore, seems to us that the words "for purposes of education," in the first clause, are defined and limited in meaning to the subject they refer to; that they are confined by the wording of the second clause to a singular meaning, and should be understood as if they read, "purposes of common school education." The words "*that* purpose" express the scope and limit of the taxation referred to, and if it had been intended to prohibit taxation for any kind of education, save common school education, it is likely it would have been done in positive terms.

If the above view be incorrect, then the wording of the Constitution leaves the question at least in doubt, and we turn to the extrinsic aids for construction. They demonstrate the correctness of our view.

The original of the school fund named in the Constitution came from the general government. In 1836

it distributed among the States a large surplus of
money, this State's portion being nearly one million
five hundred thousand dollars. It should, perhaps,
in view of the understanding with which the dona-
tion was made, have set apart the entire sum for the
support of a general system of education. It did
so, however, in 1837, to the extent of one million
dollars. In 1838 the Legislature reduced the sum to
eight hundred and fifty thousand dollars, for which
sum State bonds, bearing interest payable semi-annu-
ally, were issued to the Board of Education. Those
in authority regarded this as a debt due by the State
to itself; therefore, the payment of interest was neg-
lected, to which default the Legislature, by its action,
was a party. The money thus donated to the State
was, in the main, used in the construction of internal
improvements. In 1845 the Legislature directed the
Board of Education to surrender the bonds that had
been executed to it to the Governor, with directions
that he burn them, lists thereof being kept, and this
was done. The friends of common school education
became alarmed. In 1848 the Legislature passed an
act which recognized the sacredness of the original
debt, directed the execution of a bond to the Board
of Education for its unpaid interest, amounting then
to nearly three hundred thousand dollars, but made it
payable *at the pleasure of the Legislature*, and or-
dered a vote of the people as to whether a tax of
two cents on the one hundred dollars of taxable prop-
erty should be levied "for the purpose of establish-
ing more permanently a common school system in the
State." It carried by a very large majority. The

convention that framed our present Constitution met
the following year.    The public mind was still ex-
cited in regard to the then recent invasion of the
common school fund.    This was the mischief to be
remedied, and it was to be done by placing the bond
beyond the caprice of future Legislatures.    It then
existed only by legislative sufferance, as neither of
the first two Constitutions of the State contained any
provision as to education.    Prior to 1849, we do not
think, in the light of all historical information at
hand, it can fairly be said there was any conflict be-
tween the friends of higher and lower education.    If
so, it is likely it would have been carried into the
convention of that year, and there is no trace of it.
The debates in that body show that this was not the
question before it.    It was never named.    This silence
is significant in the consideration of this case.    The
purpose was, in the language of one of the leading
members of the convention, "to place the common
school fund beyond legislative control."    Its integ-
rity in the future was the object in view.    Some
favored a future tax for it by constitutional guar-
anty, while others, although in favor of making the
then fund inviolate, desired to leave future taxation
to the legislature.    This was the main ground of dif-
ference.    The last view prevailed, and it clearly ap-
pears from the debates that not only the members
generally, but especially the author (Mr. Wickliffe)
of this article of our Constitution, used the terms
"educational purposes" and "common school pur-
poses" as synonymous terms.    While a Constitution
derives its force from its adoption by the people, and

the debate in the convention which framed it is by
no means conclusive of its meaning, as some members may have accepted it in one sense and some in
another, yet, in the language of Judge Cooley, "When
the inquiry is directed to ascertaining the mischief
designed to be remedied, or the purpose sought to
be accomplished by a particular provision, it may be
proper to examine the proceedings of the convention
which framed the instrument.    Where the proceedings clearly point out the purpose of the provision,
the aid will be valuable and satisfactory." (Cooley's
Con. Lim., 66.)

It can not be presumed that the people, when they
accepted the Constitution, were ignorant of the events
which led to the adoption of this provision.    They
were then a part of the history of the State.    The
people were aware of the mischief to be remedied,
and of the real purpose and meaning of this provision.    It has received this construction for so long
by the other departments of the State government
that the argument *ab inconvenienti* has force.    Other
institutions of an educational character, and which
do not constitute a part of our common school system, have for years been supported by general taxation.    It is said they are of a charitable character,
and are so supported upon this ground, education
being merely incidental, and not primary, in their
existence.    Grant that this is true as to some of
them; but it can hardly be so said of the "Institution for the *Education* of the Blind," where, as the
act of incorporation and the subsequent acts in support of it show, the primary purpose is to educate

the inmates of the institution. If a county or city or a town may levy a tax to support a school other than a common school, while the State can not do so, then an arm or subdivision may do what it can not do, and thus defeat this provision of the Constitution, if it, in fact, inhibits such a tax.

If it be true that the framers of our Constitution intended to forbid any public aid to any educational institution save our common schools, then they did that which, so far as we have been able to examine, has been done in no other State in the Union; and to-day, in many of them, as in Illinois, Virginia and Michigan, higher institutions of learning than their common schools are liberally supported by general taxation, reflecting credit upon them, and drawing many of our youth there for liberal education.

In our opinion, this article of the Constitution, when all of it is considered, and especially when read in the light of its history, the mischief intended to be remedied, and the practical construction which has been given to it, does not forbid aid by the State to an educational institution other than a common school, if the Legislature, in its wisdom, sees fit to extend it. The framers of it and the people adopting it were moved, not by a fear of too much education, but of too little, by a future diversion of the school fund to other purposes.

The judgments, holding the statutes in question to be constitutional, are affirmed.

Judge LEWIS dissenting.