## THE TRUSTEES OF RUTGERS COLLEGE ET AL. v. J. WILLARD MORGAN, COMPTROLLER.

Argued November Term, 1903—Decided February 23, 1904.

1. Article 4, section 7, paragraph 6 of the state constitution prohibits the legislature from appropriating any part of the school fund to any free public school to which all the children of the state between the ages of five and eighteen years are not admitted. It cannot be applied to any other purpose whatever by which it might be diminished to such an extent that such free public schools might at any time be without sufficient support.

2. This provision of the constitution is not a limitation of legislative power over the subject of free public education. It prescribes what must be done with the school fund, not what may be done at the public expense out of the general funds of the state. The facilities for free public education are to be provided by the legislature within the exercise of a sound discretion subject only to constitutional restraints, which must be found in expression or clear implication.

3. It was competent for the legislature to establish an agricultural college at Rutgers and to support it out of the state's general fund, and the legislation on that subject is not infirm by reason of the constitutional provision against private, special or local legislation, or by reason of the further provision "that no donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation."

4. These provisions of the constitution do not bar instrumentalities for public education provided by the state and under its own control, if the legislation is general, and the appropriation is made for such state schools. They were designed as an insurmountable barrier to giving free state aid, and to donations to private or sectarian schools, and not intended to narrow or circumscribe the legislative power to furnish facilities by general laws for public education under its own supervision.

5. Substantial classes may be selected for education as well as property may be selected by a proper classification for taxation.

6. Taking all the legislation in this case under review, the legislature, by providing by the act of April 7th, 1903, for payment of the claim in controversy out of the state's general fund, manifested an intention to impose on the state an obligation to liquidate it, if that mode of payment would remove the constitutional restraint, and that meaning should be given to the proviso in the act of April 17th, 1903.

7. The injunction in the proviso of the act of April 17th, 1903, is directed to the state treasurer only, and does not impair the force of a *mandamus* issued to the comptroller.

On application for *mandamus.*

Before Justices VAN SYCKEL and FORT.

For the relator, *Richard V. Lindabury.*

*Contra, Robert H. McCarter,* attorney-general.

The opinion of the court was delivered by

VAN SYCKEL, J. This is an application for a writ of *mandamus* to compel the state comptroller to draw his warrant in favor of the treasurer of Rutgers college for $80,000.

The claim for a *mandamus* is rested upon the following basis, which is set up in the brief for the relator as follows:

"By an act entitled 'An act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts,' approved July 2d, 1862, the congress of the United States donated certain of the public lands to the several states and territories and provided for the issue of land scrip as evidence thereof. The fourth section of this act provided that all moneys derived from the sale of the scrip should be invested, and that the moneys so invested should constitute a perpetual fund, the capital of which should remain forever undiminished, and the interest should be inviolably appropriated to the endowment, support and maintenance of at least one college, where the leading object should be, without excluding other scientific and classical studies and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts in such manner as the legislatures of the several states might respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

"The fifth section declared that the grant was made upon certain conditions, the assent to which by legislative enactment was required before the grant should become operative. The

first condition was that if any portion of the fund invested should be diminished or lost it should be made up by the state and the annual interest regularly applied without diminution to the purposes mentioned in the fourth section. The second condition was that no portion of the fund, nor any interest thereon, should be applied directly or indirectly, under any pretence whatever, to the purchase, erection, preservation or repair of any building or buildings. The third condition was that any state which should take and claim the benefit of the act should provide, within five years at least, not less than one college as described in the fourth section, or the grant to such state should cease and the state should be bound to pay to the United States the amount received for any land previously sold.

"By an act passed March 21st, 1863, the legislature of the State of New Jersey accepted the grant made by the congressional act referred to, 'for the purposes and upon the conditions in said act of congress specified.' By the same act commissioners were appointed to receive the scrip and convert it and invest the proceeds according to the terms of the grant:

"By an act passed by the legislature of New Jersey April 4th, 1864, the governor, attorney-general, comptroller and treasurer were appointed a commission to administer the fund realized upon the sale of the land scrip and were directed to pay over the interest of the fund semi-annually to the trustees of Rutgers college for the special purposes and upon the special conditions therein referred to. These conditions were that the said trustees should devote said interest wholly and exclusively to the maintenance in that department of Rutgers college, known as Rutgers Scientific School, of such courses of instruction as should carry out the intent of said act of congress, in the manner specifically prescribed by the fourth section thereof; that said trustees should furnish gratuitous education in said courses to pupils of said school in such manner as the legislature should prescribe—the pupils to be so received gratuitously into said school to be in each year

such a number as would expend a sum equal to one-half of the said interest for the same year in paying for their instruction at regular rates; that the trustees should obligate themselves to erect additional and adequate buildings as soon as the same might become necessary, without charge to or upon the state; that the instruction of said school should be under the supervision and control of a board of ten visitors, to be appointed by the governor with the advice and consent of the senate, who should report annually to the legislature; that students of agriculture and the mechanic arts should be admitted into the college upon the recommendation of the board of chosen freeholders of their respective counties, and that the number to which each county should be entitled should be in proportion to the number of representatives of such county in the legislature.

"March 28th, 1888, the legislature passed an act providing for the examination of candidates for state scholarships at the agricultural college by a board of examiners under rules to be prescribed by the faculty of the college and the state superintendent of public instruction.

"March 5th, 1888, the legislature passed an act in which it was declared that the trustees of Rutgers college had received the proceeds of said congressional fund and had faithfully carried out the provisions of the laws of the United States and of the State of New Jersey relating thereto, and had maintained, and were then maintaining, the State Agricultural College of New Jersey in its various departments in pursuance of and as required by the laws of the state, and that 'the said institution is the State Agricultural College of New Jersey.'

"On the 31st of March, 1890, the legislature passed an act entitled 'An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college.' The act reads as follows:

" '1. *Be it enacted* by the Senate and General Assembly of the State of New Jersey, That in order that students in the

schools in all parts of the state may receive the stimulus afforded by the opportunity to pursue the courses of study in the state agricultural college, and in order to enable said state agricultural college to furnish instruction gratuitously to students, residents of this state, in its several courses of study as special courses of advanced study in the public school system of this state, there shall be sent to the said college students to the number of one each year from each assembly district in this state, to be selected and designated as hereinafter provided, who shall receive gratuitous instruction in any or in all the prescribed branches of study in any of the courses of study of said state college, under the general powers of supervision and control possessed by the board of visitors of said state college; said students so received shall be residents of this state, and shall be admitted into said state college upon the terms and subject to the rules and discipline which shall apply to all other free students of said state college; and if there should be more than one suitably prepared applicant from the same assembly district in the same year, such additional applicants may, in the discretion of the board of visitors of the state agricultural college, be received on any vacant scholarships of any other assembly districts until such districts shall require such scholarships, after notice has been served on the superintendent of education of the county in which such vacant assembly districts are situated.

" '2. *And be it enacted,* That said students shall be selected as follows: A competitive examination, under the direction of the city superintendents and the county superintendent of education, in each county, shall be held at the county court house in each county of the state, upon the first Saturday in June in each year, and the necessary traveling expenses of said examiners not otherwise provided for by law, on the approval of the president and secretary of the board of visitors of said state agricultural college, shall be paid by said state college; students who apply for examination shall be examined upon such subjects as may be designated by the faculty of said

college and the state board of education; and the said city and county superintendents shall report to the president of said college and to the state superintendent of public instruction the names of all such students examined as in their opinion are suitably prepared to enter said college, with their estimate of the order of excellence in scholarship shown by said students at such preliminary examination; certificates of appointment to the state agricultural college shall be issued by the state superintendent of public instruction to all of such students as are so found to be qualified to enter said college; and in case the vacant scholarships shall not be sufficient to receive all such successful candidates, preference in appointing to vacant scholarships shall be given to successful candidates in the order of the excellence of their examination as certified by said superintendents; and in general the regulations and provisions governing the conduct of such examinations, and the appointment of said students to said scholarships shall be subject to the control of said board of visitors of said college.

" '3. *And be it enacted,* That each student so appointed and admitted to said college shall be regarded as holding a state scholarship, and for each scholarship so held there shall be paid, as hereinafter provided, on the first day of November in each year, to the treasurer of said college, the same sum of money as the said college is entitled to receive for each scholarship established in said college under the existing state agricultural fund; *provided,* that such payment shall be made only out of the income of the fund for the support of public free schools remaining after appropriations heretofore made payable out of said income are met.

" '4. *And be it enacted,* That in order to ascertain the number of scholarships for which payment shall be made as aforesaid, the president of said college shall, in the month of October in each year, make his certificate in writing, setting forth the names of the students so as aforesaid appointed and then in attendance at said college, the assembly districts from which they were appointed and the classes in college to

which they belong, or the special courses of study which they are pursuing, which·certificate, when approved by the president of the board of visitors of the state agricultural college, shall be plenary evidence of the number of scholarships for which payment shall be made, and on filing the same with the comptroller of the state he shall draw his warrant upon the treasurer of the school fund for the sum of money to which the said college may accordingly be entitled, and the said treasurer shall thereupon pay the same as aforesaid.

" '5. *And be it enacted,* That this act shall take effect immediately, and shall be subject to amendment, alteration and repeal at the discretion of the legislature.'

"These acts are all collected in the report of the state agricultural college for the year 1890.

"Rutgers college accepted the terms of the act of 1890 and has received and educated a large number of students in accordance therewith. These students were all examined by the city and county superintendents of public instruction, and certified to the college by the state superintendent of public instruction, and were instructed under the supervision of the state board of visitors, who annually reported to the legislature the full details thereof.

"By the performance of this service the college earned from the state, during the years 1890 and 1901, the sum of $133,101. The state, however, failed to pay any part of the same, except the sum of $1,500, which it paid the first year.

"On March 4th, 1902, the legislature passed an act, the title, preamble and first section of which are as follows:

" 'An act to provide for adjusting the claim of the state college for agriculture and the mechanic arts under "An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college," passed March thirty-first, one thousand eight hundred and ninety.

" 'WHEREAS, By the act, the title of which is above recited, it was enacted that one student from each assembly district in the state, to be selected by competitive examination under the

direction of the city and county superintendents of education, should be sent each year to the state agricultural college for education in the courses of study there pursued, and that a stipulated compensation should be paid therefor to the college out of the public school fund of the state; and

" 'WHEREAS, A large number of qualified students have, in accordance with said act, been received and educated in the college, but the stipulated compensation (except fifteen hundred dollars) has not been paid; and

" 'WHEREAS, The state is under a moral obligation, at least, to compensate the college for the services thus rendered in educating citizens of the state at the instance of the legislature; therefore,

" '1. *Be it enacted* by the Senate and General Assembly of the State of New Jersey, The governor of the state is hereby authorized to appoint three citizens of New Jersey as a commission to examine into and consider the matters above mentioned, and to report, in writing, to the present or next session of the legislature what compensation ought, in justice and equity, to be paid by the state to said college in full satisfaction for the services rendered, and to be rendered, up to the close of the present collegiate year, under said act of March thirty-first, one thousand eight hundred and ninety.' [See *Pamph. L.* 1902, *p.* 15.]

"Under this act, the governor appointed Hon. Amzi Dodd, Hon. Charles J. Baxter and William H. Corbin, Esq., commissioners.

"The commissioners investigated the matter so referred to them and reported to the legislature of 1903 that the college had earned, between the years 1890 and 1901 for tuition under the act of 1890, the sum of $133,110; that it had received on account the sum of $1,500, and that there was due to it a balance of $131,610. The report declares that the board of visitors appointed by the governor and confirmed by the senate had visited the college twice a year during the period covered by the performance of these services, and had made yearly reports to the legislature of their super-

vision, certifying that the trustees of the college were faithfully and liberally carrying out the provisions of their contract with the state; that in their inquiries and investigations the commissioners had learned of no reason why the amount was not paid and should not have been paid from time to time as it accrued, or why it should not now be paid in the aggregate, except some supposed or apprehended inability founded on the suggestion that the provision for payment made in the act of 1890 was void because in contravention of the state constitution. The commissioners found that this suggestion was without substance, and reported that the said sum of $131,610 was in justice and equity due from the state to the college and advised the passage of a bill submitted with the report appropriating the said sum to the trustees of the college in payment of their claim.

"The legislature, on April 7th, passed this bill in substantially the form submitted by the commissioners, but changed the amount from $131,610 to $80,000. [*Pamph. L.* 1903, *p.* 201.]

"On April 17th, the legislature passed the general appropriation bill, and inserted therein, as section 75, the following:

" 'To the treasurer of Rutgers college, to pay the state agricultural college for the benefit of agriculture and the mechanic arts the balance due for services rendered to the state in the instruction, from September first, eighteen hundred and ninety, to July first, nineteen hundred and two, of students holding free state scholarships, the sum of eighty thousand dollars is hereby appropriated; *provided,* such sum is authorized by enactment of the present legislature, such payment to be actually made by the treasurer of the state only and when the act under which such services were rendered, entitled "An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college," passed March thirty-first, eighteen hundred and ninety, shall have been judicially determined to be valid and constitutional.'

"On the 26th of May, 1903, the relators demanded of the state comptroller that he draw his warrant in favor. of the treasurer of the college for $80,000 to pay the said claim as allowed by the act of April 7th, offering to release the state from all claims and demands upon the delivery of said warrant.   The demand was refused, whereupon this application was noticed."

*First.* It is insisted that the comptroller was justified in refusing to issue his warrant, because the act of April 17th, 1903, prohibited him from doing so until it was judicially determined that the act of March 31st, 1890, is valid and constitutional, such determination not having as yet been made.

The reading of the act shows that no inhibition was directed to the comptroller; it expressly prohibits the state treasurer from paying the $80,000 until the act of March 31st, 1890, is declared to be constitutional; it is the payment of the money by the treasurer on the warrant which is stayed, he having been previously directed by the act of April 7th, 1903, to pay the warrant, leaving the comptroller with respect to his duty subject to the prerogative writ.

*Second.* It is contended that the act of March 31st, 1890, is unconstitutional, because it seeks to appropriate to Rutgers college moneys arising out of the income of the funds for the support of public free schools.

The provisions of the state constitution, article 4, section 7, paragraph 6, are invoked to sustain this contention.   It provides as follows:

"The fund for the support of free schools and all money, stock and other property which may hereafter be appropriated for that purpose or received into the treasury under the provision of any law heretofore passed to augment the said fund, shall be securely invested and remain a perpetual fund; and the income thereof, except so much as it may be judged expedient to apply to an increase of the capital, shall be annually appropriated to the support of public free schools for the equal benefit of all the people of the state; and it shall not be competent for the legislature to borrow, appro-

priate or use the said fund or any part thereof for any other purpose under any pretence whatever. The legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this state between the ages of five and eighteen years."

The language of this paragraph clearly indicates that the intent of its framers was to preserve the school fund for the sole purpose of maintaining free public schools for all children of the state between the ages of five and eighteen, and that it should not be applied to any other purpose whatever by which it might be diminished to such an extent that such free public schools might at any time be without sufficient support. The provision is mandatory, and the expression of this care for the unimpaired maintenance of these free public schools to which all the children must be admitted, excludes the competency of the legislature to make any other appropriation of the school fund for part only of such children.

Assuming that the act of March 31st, 1890, is infirm and unconstitutional by reason of appropriating a part of the school fund for scholarships in the agricultural college, two questions are presented by this case.

*First.* Had the legislature power to establish an agricultural college or any other educational institution to which all children between the years of five and eighteen were not admitted?

The federal fund was passed to the State of New Jersey in 1862 and accepted by the state with an undertaking with the federal government that if any part of the fund should be lost the state would make it good, and further would, within five years, provide at least one college to effectuate the purposes for which the federal appropriation was made.

By an act passed on March 21st, 1863, the state legislature accepted the grant made by the act of congress "for the purposes and upon the conditions in the act of congress specified."

By the acts of 1864 and 1888 the state adopted and established Rutgers scientific school as the state agricultural college and provided for free scholarships there.

The acceptance of the federal endowment with its accompanying terms led to legislation which clearly committed the state to the intention and purpose of paying out of state funds such sum in addition to the federal endowment as would be necessary to secure and maintain the proposed scholarships provided for in the said several legislative acts.

That the state had the power to establish an agricultural college with the grant to it of the income of the federal endowment, I think, cannot be successfully controverted, and it seems equally clear that the state might give the necessary additional support out of the state's treasury, conceding the power to create the college.

The facilities for education are to be provided by the legislature, subject only to constitutional restraints.

The government of the United States was formed with enumerated powers, and therefore, to support the power of congress, we must find in the federal constitution a grant of power broad enough to embrace the power exercised, but the power of a state legislature cannot be denied unless we find in the constitution of the United States or of the state that it is prohibited.   *Maxwell* v. *Goetschius,* 11 *Vroom* 383; *Cooley Const. Lim.* 223.

A power must be found to be given in the former case; a restraint must be expressed in the latter case.

There is no constitutional limitation which restrains the state legislature from establishing an agricultural college. It promotes a branch of education beneficial to the state, and support for it can be found in many judicial decisions. *Commonwealth* v. *Hartman,* 17 *Pa. St.* 118; *Stuart* v. *School District,* 30 *Mich.* 69; *Higgins* v. *Prater,* 14 *S. W. Rep.* 910; *Briggs* v. *Johnson County,* 4 *Dill.* 148.

The injunction in the organic law that free public schools shall be established and maintained for all children between the ages of five and eighteen years does not exclude the legis-

lative power to provide for the education of persons not within that class. The former must be provided for; the latter may be an object of legislative concern.

The act of March 31st, 1890, is entitled "An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college."

If the legislature had power to create an agricultural college it must be conceded the power to support it and to add to it its efficiency at the public expense, otherwise the power to create would be nugatory.

By the act of 1874, inserting section 27 in the School law, the legislature adopted the agricultural college as part of its school system, giving to the state superintendent the right to examine candidates for scholarships, enabling the legislature thereby to provide for its support out of any state funds except the school fund.

The legislation upon which the state's obligation must rest, it is insisted, is infirm, for two reasons:

*First.* That it is prohibited by the constitutional provision against enacting private, local or special laws providing for the management and support of public schools.

The legislation applies to no locality to the exclusion of others; it provides a scholarship for every assembly district in the state; it operates upon the whole class on which it is intended to operate, and the classification is not illusory or evasive. It selects as the class those who have the highest attainments, giving to everyone an equal opportunity to secure the prize.

Substantial classes may be selected for education by the state as well as property may be selected by a proper classification for taxation.

The legislature has provided for the instruction of deaf and dumb, blind and feeble-minded persons (*Gen. Stat., p.* 1179); it has passed an act founding the state institution for the deaf and dumb (*Gen. Stat., p.* 1181); the act "providing for the establishment of schools for industrial educa-

tion" (*Gen. Stat., p.* 3069); the act "for the promotion of manual training" (*Gen. Stat., p.* 3072); the act providing for a course in clay working and ceramics in the state agricultural college (*Pamph. L.* 1902, *p.* 34); the acts creating the Newark technical school, the school for industrial education at Hoboken and for industrial art at Trenton.

All these acts are futile unless the right of the state to establish and support the agricultural college can be sustained.

The constitution of Pennsylvania requires the legislature to provide schools for the instruction of the poor, gratis.

In *Commonwealth* v. *Hartman, supra,* the Supreme Court upheld a law establishing schools for the free education of persons between the ages of five and twenty-one.

Chief Justice Black said that it seems to be believed that the constitution is a limitation on the power of the legislature, and that no law can be valid which looks to any other object than the teaching of the poor, gratis. The error, he said, consisted in supposing the constitution to define the maximum of the legislative power, while in truth it only fixes the minimum. It enjoins them to do thus much, but does not forbid them to do more.

To the like effect is *Higgins* v. *Prater, supra,* a Kentucky case, and *Briggs* v. *Johnson County, supra.*

"The test of a special law is the appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes that makes it special, but what it excludes. If nothing be excluded that should be contained, the law is general." *Budd* v. *Hancock,* 37 *Vroom* 133.

Thus tested, the legislation in respect to the agricultural college is not inimical to this constitutional guarantee.

*Second.* Does it violate section 20 of article 1, which provides "that no donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation?"

This provision, as well as that relating to special laws, does not bar instrumentalities for public education provided by

the state and under its control by general laws where the appropriation is made for such schools. They were designed as an insurmountable barrier to giving free state aid, and to donations to private or sectarian schools, and should be rigidly enforced; but they were not intended to narrow or circumscribe the legislative power to furnish facilities by general laws for public education under its own supervision.

The cases of *State Normal School* v. *The Auditors,* 79 *Va.* 233, and *Hall's Free School Trustees* v. *Horne,* 80 *Id.* 470, cited in the very able brief of the attorney-general, involved the right of the lawmaker to encroach upon the fund set apart by the state constitution for the support of free public schools specified therein.

The Rutgers agricultural college was adopted as a state college, and such full control was maintained over it by the state as was deemed to be necessary to secure free public education in the department of agriculture and the mechanic arts.

In my judgment, therefore, these two provisions of the fundamental law do not invalidate the legislation on the subject in hand.

The payment of a recognized moral obligation assumed for services rendered is within the legislative power, and its discharge does not constitute a donation of the public funds. *Cleveland* v. *Board of Finance,* 9 *Vroom* 259; *Rader* v. *Township of Union,* 10 *Id.* 509.

The only remaining question is, whether the acts of April 7th and April 17th, 1903, in connection with the several acts previously passed, will justify payment by the state treasurer of the warrant for $80,000 to be drawn by the comptroller?

The act of March 31st, 1890, shows the intention of the state to secure the scholarships by a promise to pay for them, although the mode provided for payment did not furnish legal authority for making it. Good faith, however, must be imputed to the legislature, and it must be charged with an intention and an obligation to pay for what it obtained.

The situation we then have is this: The agricultural col-

lege was adopted as a state college for the purpose of imparting free public education; an effort, which proved to be futile, was made by the act of 1890 to support it out of the school fund, the terms of the act being accepted by Rutgers; by the performance of the engagements on the part of Rutgers the agricultural college earned from the state, between the years 1890 and 1901, the sum of $133,101, of which the state has paid only $1,500.

On March 4th, 1902, the legislature passed an act to adjust the claims of the state college for the services performed under the act of 1890.

That act recited the moral obligation at least to compensate the college for such services in educating citizens of the state at the instance of the legislature, and the governor of the state was thereby authorized to appoint three citizens of New Jersey as a commission to examine and report in writing what compensation ought, in justice and equity, to be paid to the state college in full satisfaction of its claim.

That commission was appointed, and reported that in justice and equity $131,610 was due to the college, and advised the passage of a bill authorizing an appropriation for that sum.

The legislature, on the 7th of April, 1903 (*Pamph. L., p. 201*), passed a bill appropriating out of the state treasury $80,000, and directed the state comptroller to draw a warrant for that sum in favor of the treasurer of the college and ordered the state treasurer to pay it on condition of its being accepted in full satisfaction of the claim. On the 17th of April the state appropriation bill was passed, by which it was ordered that the sum of $80,000 be paid to the state agricultural college for the services rendered from September 1st, 1890, to July 1st, 1902, provided the act of March 31st, 1890, shall have been judicially determined to be valid and constitutional.

By an act passed June 10th, 1895, it was provided that after November 1st, 1895, no money should be drawn from the treasury unless it should have been explicitly appropriated

by the annual appropriation bill to the purpose for which it is drawn.

A bill authorizing an appropriation is required, and its payment must be provided for, in the annual appropriation bill. Both these requirements were complied with in respect to this claim of the agricultural college.

What, then, was the meaning and extent of the proviso in the act of April 17th? After attempting to provide, by the act of 1890, for payment for services to be rendered to the state and declaring, by the act of 1902, that these services had been rendered, and that there existed at least a moral obligation to pay for them, which it must be admitted the state could not creditably repudiate or fail to honor; after appointing a commission to ascertain what in justice and equity should be paid by the state; after providing for a compromise by which more than one-third of the sum reported by the commission was rebated, and after passing a special act making an appropriation for $80,000, could it have been the intention of the legislature to make so feeble an attempt to discharge its admitted moral obligation as to impose upon the relator the burden of establishing the power of the legislature to encroach upon the school fund, after two attorney-generals of the state had declared it could not be done?

Taking all this legislation under review, the recognized obligation to pay the claim, the expressed desire to be equitable and just, and the passing of an act prescribing a legal method of payment, the only inference, giving the legislature credit for fairness, is that payment should be made if it is competent for the legislature to provide for payment out of the state's general fund. We must attribute to the legislature an intention to pass an act which would enable the state to pay, and not an act to avoid a payment which it had capacity to authorize, and which was declared to be equitble and just.

When the act of April 17th, 1903, was passed, the claim in dispute could have been liquidated only by the act of April 7th out of the state's general fund, and not out of the school

fund. The legislature having acknowledged the justness of the claim and expressed a desire to pay it, it was immaterial whether the mode of payment in the act of 1890 was legal, and therefore the only purpose of the proviso in the act of April 17th that can be ascribed to the legislature, giving it credit for sincerity and honorable dealing, was to ascertain whether it was competent to pay it out of the general fund.

If the state could not legally establish the agricultural college, no money could be withdrawn from the state treasury on its behalf, and therefore the purpose of the act of April 17th, 1903, was to ascertain whether payment could lawfully be made for services rendered under the act of 1890, with the added provision for payment contained in the act of April 7th.

The legislature, by providing a different mode of payment, manifested an intention to impose on the state an obligation to liquidate the claim, if the new mode of payment would legalize its action, and that meaning should be given to the proviso in the act of April 17th.

An unconstitutional act may be rendered valid by amendment. *Allison* v. *Corker,* 38 *Vroom* 597.

But whether or not the act of April 7th can be regarded as a legal mode of amending the act of 1890, it is valid legislation and must be construed in connection with that act, thereby substituting a legal mode of payment for the illegal one adopted in the act of 1890.

This legislation must be dealt with not only as legislation, but also as an agreement to pay a just claim against the state, which the legislature was competent to make.

The expressed purpose of the legislature was to dispense equity and justice with respect to this claim, which was declared to impose at least a moral obligation on the state. Where under the facts disclosed a construction by which the right fails to prevail is allowed to predominate, equitable and just dealing ends by the defeat of the legislative intent. The spirit and reason of all this legislation forbids such an interpretation.

In my judgment, therefore, legal authority exists for the payment by the state treasurer of a warrant for the payment of the $80,000 when it is drawn by the comptroller, and the *mandamus* should be issued as applied for.