# Commonwealth v. Kentucky Jockey Club et al.

(Decided March 3, 1931.)

(Rehearing denied June 16, 1931.)

740

J. W. CAMMACK, Attorney General; M. B. HOLIFIELD, Assistant Attorney General; ELWOOD HAMILTON and COLEMAN TAYLOR for appellant.

A. J. CARROLL, A. B. BENSINGER, H. E. McELWAIN, Jr., and MAURICE GALVIN for appellees.

PER CURIAM OPINION—Reflecting the Views of the Various Judges on the Several Questions Presented.

The commonwealth instituted an action in equity against the Kentucky Jockey Club, Latonia Jockey Club,

and Churchill Downs, to inquire into the character of their past transactions, and to regulate the scope of their future conduct. The petition presented a threefold aspect, asking relief of an equitable character, embracing also an action in the nature of a quo warranto to forfeit the charters and franchises of the several corporations and seeking incidentally! to recover a large sum of money as damages.

The right to forfeit the franchises of the three defendants was claimed upon the grounds:

(1) That they had operated the pari mutuel system of betting on horse races within the inclosures at the race tracks, and while the races were being run thereon, under licenses from the state racing commission, upon the assumed authority of statutes that were unconstitutional and void.

(2) That they had committed offenses against the statutes of the state designed to prevent and to punish corrupt lobbying and pernicious political practices.

(3) That they had committed acts and engaged in transactions not prohibited or punished by any particular statute, but detrimental to the public welfare, and violative of the implied and express contracts upon which the continuance of the corporate franchises were conditioned, and which constituted an abuse and misuse of their powers.

The prayer for an injunction was predicated upon an assumption of the accuracy of the grounds of forfeiture just recited, and was designed to restrain the defendants from the use of their property for the creation or continuance of a public nuisance, and from threatened violation of penal statutes, respecting race track gambling and the corruption of elections.

A substantial sum of money was demanded as damages on account of the acts for which forfeiture of franchises was claimed, and as an incident to the relief sought in that part of the action in the nature of a quo warranto.

The final feature of the petition, and which, in connection with the claim for an injunction, constituted its character as an action for equitable relief, was designed to subject the assets of the Latonia Jockey Club and Churchill Downs, derived by them from the Kentucky Jockey Club, to the satisfaction or the damages demanded from the latter because of its conduct as de-

744

lineated in the petition. The defendants challenged every position taken by the commonwealth in the petition.

The chancellor held: (a) That the statutes permitting pari mutuel betting on horse races under certain conditions were constitutional and valid; (b) that the commonwealth was not entitled to an injunction; (c) that the right to relief against the Kentucky Jockey Club for its other alleged acts was not defeated by its dissolution or the devolution of its property to its creature corporations, and that a substantial fine could be imposed upon it, as an incident to the ouster, if that action was found justified, but in the determination of which it was entitled to a jury trial; (d) that if the commonwealth recovered a substantial judgment as a penalty, fine, or damages in the civil action in the nature of a quo warranto, it would have the right in equity to subject the assets of the two creature corporations, received from the Kentucky Jockey Club in consideration of their capital stock, to the satisfaction of such judgment. The case, therefore, was transferred to the common pleas branch for the trial of the issues concerning which defendants were entitled to a jury trial. Judge Dailey, to whom the case was referred, reconsidered the issues raised, and decided that the petition failed to state a cause of action against the Kentucky Jockey Club, since it did not contain allegations excluding the operation of section 1138, Kentucky Statutes, providing that "prosecutions by the commonwealth to recover a penalty for a violation of any penal statute or law" shall be commenced within one year after the right to such penalty accrued, and not thereafter, "unless a different time is allowed by the law imposing the penalty." He held that no cause of action was stated against Churchill Downs sufficient to authorize a forfeiture of its charter, and that the Latonia Jockey Club was not suable in Jefferson county for anything alleged against it. The rulings resulted in a final dismissal of the action, and the commonwealth complains thereof.

■ The first question to be disposed of is the validity of the various statutes exempting the pari mutuel system of betting on horse races under certain conditions from the operation of the anti-gambling laws. A brief history of the course of legislation and judicial decision upon the subject is appropriate. In 1881, this court decided that the machine known as French pool or pari

mutuel was "a contrivance used in betting," within the denunciation of the statutes then in force. Com. v. Simonds, 79 Ky. 618; Cf. Elias & Co. v. Gill, 92 Ky. 573, 18 S. W. 454, 13 Ky. Law Rep. 798. In 1886 the Legislature enacted the law constituting the present sections 1960 and 1961 of the Kentucky Statutes. The original bill passed by the Senate contained no exemptions of any character. In the House an amendment was added by which it was provided: "This act shall not apply to persons who may sell combination or French pools on any regular race track during the races thereon." The Senate accepted the amendment, and so the act was adopted and approved March 25, 1886. 1 Session Acts 1885-86, p. 36; Gen. Stats. (1887 Ed.) p. 692.

After the adoption of the present Constitution, the Statutes were revised, re-enacted, and republished as Kentucky Statutes, and the present sections 1960, 1961, were carried forward in that revision, Acts 1891-92-93, c. 177, p. 740, secs. 6, 7.

In 1906 an act was adopted creating the state racing commission and defining its powers and duties. Ky. Stats., secs. 3990a-1 to 3990a-5. It was empowered to prescribe the rules under which running races could be conducted in this commonwealth.

In 1908 the "Pool Room Act" was enacted, with comprehensive inhibitions, but containing this exemption:

"The provisions of the act shall not apply to enclosures during regular race meetings or such enclosures wherein horse racing is being conducted under license from the state racing commission, and it shall not apply to enclosures during regular race meetings wherein trotting and pacing races are being conducted by regularly organized associations organized for that purpose." Kentucky Statutes, sec. 3914b-6. This act was held valid in Com. v. Starr, 160 Ky. 260, 169 S. W. 743.

In 1920, section 1328a, Kentucky Statutes, was passed prohibiting betting on horse races, except at authorized race meetings held pursuant to license from the state racing commission. At the same session a tax of $2,500 for each day races were run was imposed upon

each race track under the jurisdiction of the state racing commission. Section 4223b-1, Ky. Stats.

In 1908 the case of Grinstead v. Kirby, 110 S. W. 247, 33 Ky. Law Rep. 287, was decided. The opinion did not discuss the validity of the various statutes then in force. It dealt only with a construction thereof. The court tacitly assumed the constitutionality of the statutes. In the course of the opinion, it was said:

"When the new Constitution came into effect, and special legislation was prohibited, it was perceived by the Legislature that some general provision must be made if the privileges which these racing associations then enjoyed were to continue. The raising of horses for the track had long been a favored industry in a large part of the state and much capital was invested in it. The Legislature evidently had in mind granting a privilege to the regular race tracks during the races thereon. . . . The object of the exception was not to protect those who sell the pools. What the Legislature had in mind was the benefit to the regular race tracks during the races thereon . . . It cannot be presumed that the Legislature intended in one section of the act to legalize the selling of the pools and in another section to impose a penalty on all those who buy pools. . . . But manifestly the Legislature intended that the selling of combination or French pools on any regular race track during the races thereon should not be illegal."

In State Racing Commission v. Latonia Agricultural Association, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. (N. S.) 905, the question presented was the validity of a rule of the racing commission to prohibit "book making" on the race courses and to prescribe the pari mutuel system of betting. In the opinion it was said (page 182 of 136 Ky., 123 S. W. 681, 684):

"But the Legislature by section 1961 excepted race track from the operation of the 'Paris-Mutual' system of betting, which was sustained by this court as a legitimate exercise of police power. in Grinstead v. Kirby, 110 S. W. 247, 33 Ky. Law Rep. 287."

The court then was composed of the members which had constituted it less than two years before when the case of Grinstead v. Kirby was decided.

In the City of Louisville v. Wehmhoff, 116 Ky. 812, 76 S. W. 876, 79 S. W. 201, 25 Ky. Law Rep. 995, 1924, it was said:

"French pool or Paris Mutual is a 'machine or contrivance used in betting,' as is shown by its description in Commonwealth v. Simonds [79 Ky. 618], supra. Furthermore, section 1961, Ky. St. 1903, indicates that it was so regarded by the Legislature. For in that section it is said that the change of the name of the games or contrivances 'mentioned or included in the preceding section shall not prevent the conviction of any person violating the provisions thereof. . . . Nor shall its provisions apply to persons who sell combination or French pools on any regular race track during the races thereon.' In French pool the operator of the machine does not bet at all. He merely conducts a game, which is played by the use of a certain machine, the effect of which is that all who buy pools on a given race bet as among themselves; the wagers of all constituting a pool going to the winner or winners. The operator receives 5 per cent. of the wagers as his commission. But in selling ordinary pools on horse races the seller does not operate a 'machine or contrivance used in betting.' Neither does he bet on a horse race. Such was the express decision of this court in Cheek v. Commonwealth, 79 Ky. 359, 2 Ky. Law Rep. 339. Therefore, as said by the court in that opinion, 'there is no express statutory penalty against the specific act of selling pools.' In that opinion the other statute referred to by counsel (what is now section 1960) was referred to, and held not to include pool selling, while French pool was held by the court in the Simonds case, supra, to be under that statute."

The case of Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474, 475, involved the validity of a rule of the racing commission prescribing the minimum purses to be given by any race track at a meeting held under the authority of the commission. The rule was challenged upon the ground that it exceeded the power of the commission, and that it constituted a dis-

crimination among those in similar situations. In the opinion it was said:

"In State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. (N. S.) 905, this court declared that act to be constitutional and valid: . . . that it is a police regulation, outlawing all racing except as licensed by the commission, who shall in advance prescribe the general conditions upon which the license may be obtained; and that it invests the commission with the power to ascertain the fact whether or not a given applicant for license is so situated as to conduct orderly, lawful public races, 'to ascertain and set forth the particular states of fact that will promote the breeding of thoroughbred horses, and the conducting of legitimate races, and to prohibit the evil of unlawful gambling on the race courses.' "

The power of the commission in the premises and the propriety of its exercise in the instance presented were upheld by the court.

In Erlanger Kennel Club v. Daugherty, 213 Ky. 648, 281 S. W. 826, 830, it was said:

"Learned counsel in an amicus curiæ brief asks us to declare unconstitutional and invalid the provision in section 1961, supra, of our statutes exempting from the provisions of section 1960 'persons who sell combination or French pools on any regular race track during the races thereon,' and also declare invalid the exclusion contained in section 3914b-6 from the operation of the provisions of the Pool Room Act. But since the case may be disposed of (as we have already done) without consideration of those questions, and since the parties who would be directly affected thereby are not parties to this litigation, we have concluded to not take up or in any manner consider those questions in this opinion."

In the light of this legislative and judicial history, we come to consider the present attack by the commonwealth upon the constitutionality of the exemption contained in section 1961. The commonwealth invokes the Constitution, and relies upon section 226, forbidding lotteries, section 3 against special privileges, except in consideration of public services, section 51 concerning

the title of acts, section 59, subsection 4, inhibiting the passage of local or special acts "to regulate the punishment of crimes and misdemeanors, or to remit fines, penalties or forfeitures," and subsection 29, precluding all special laws where a general law can be made applicable to the subject, and section 60, restraining the General Assembly from enacting any special or local Act by the repeal in part of a general act, or by exempting from the operation of a general act any city, town, district, or county.

Section 226 of the Constitution reads:

"Lotteries and gift enterprises' are forbidden, and no privileges shall be granted for such purposes, and none shall be exercised, and no schemes for similar purposes shall be allowed. The general assembly shall enforce this section by proper penalties. All lottery privileges or charters heretofore granted are revoked."

The argument for the commonwealth, somewhat abridged, is that the words of the Constitution must be construed in their ordinary sense, most obvious to the common understanding of the people who ratified the instrument, and that the contemporaneous construction cannot be invoked to ascertain the meaning when the words used are themselves perfectly plain and free from ambiguity. Proceeding from that postulate, a definition of lottery is given which is thought to embrace betting on horse races by the pari mutuel system, which prevents it from being legalized by the Legislature. A lottery, it is said, is a species of gambling, defined as a scheme for the distribution or prizes or things of value, by lot or chance, among persons who have paid, or agree to pay, a valuable consideration, for the chance to share in the distribution, or as a game or hazard in which small sums of money are ventured for the chance of obtaining a larger value in money or other articles. 25 Cyc. 1633; 38 C. J. p. 286; 19 Am. & Eng. Enc. of Law (2d Ed.), p. 588; Commonwealth v. Jenkins, 159 Ky. 80, 166 S. W. 794, Ann. Cas. 1915B, page 170.

A statement from Corpus Juris is quoted as follows:

"The term 'lottery,' as defined, includes pools and pool selling on horse races and also sweepstakes on horse races, although the contrary view has been

upheld.'' 38 C. J. p. 310. The cases cited to sustain the text are: Boyland v. State, 69 Md. 511, 16 A. 132; State v. Lovell, 39 N. J. Law, 458; Irving v. Britton, 8 Misc. Rep. 201, 28 N. Y. S. 529.

The commonwealth cites also the Nebraska case of State v. Ak-Sar-Ben Exposition Co., 118 Neb. 851, 226 N. W. 705.

The New Jersey case clearly held that betting upon horse races by the system known as ''Combination or French pool'' was so affected by the elements of chance as to constitute a violation of the New Jersey laws against lotteries. It is true that chance is an essential element in a lottery, but the weight of authority does not sustain the position of the New Jersey court that the result of a horse race depends on mere chance within the meaning of that term in a definition of lottery. 38 C. J. p. 290, sec. 5; 17 R. C. L. 6-10, p. 1222; State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. (N. S.) 905; Utah State Fair Ass'n v. Green, 68 Utah, 251, 249 P. 1016; People v. Fallon, 152 N. Y. 13, 46 N. E. 296, 37 L. R. A. 227, 57 Am. St. Rep. 492, affirming 4 App. Div. 82, 39 N. Y. S. 865.

The Nebraska case held that the essential ingredients of a lottery—consideration, chance, price, and means of disbursement—were embraced in the pari mutuel system and forbidden by the laws of that state. But the distinction between a lottery and a method of gambling was not discussed, because the Constitution and laws of that state applied equally to both subjects. The other cases possess no particular weight as authority upon the problem presented. The Britton case was in effect overruled in Reilly v. Gray, 77 Hun, 402, 28 N. Y. S. 811, and the Maryland case dealt with an evasion of the lottery law by an attempt to simulate a race ticket which was lawful in that state. The evasion was held not to disguise the real transaction.

It will be seen that the argument for the commonwealth depends upon a determination that a lottery, as understood by the people in framing and adopting the Constitution, included betting upon horse races by the pari mutuel system. There is no ambiguity in section 226 of that instrument in so far as forbidding lotteries is concerned, but manifestly the meaning, purpose, and reach of the words used must be deduced from the intention they express considered in the light of the history

that pertains to the subject. "The terms used are to be construed according to their meaning at the time of the adoption of the Constitution rather than at any other time." Cooley's Constitutional Limitations, 69; 12 C. J. 706; 6 R. C. L. 51; 6 A. & E. Enc. of Law p. 925; Collins v. Henderson, 11 Bush, 74; Myers v. United States, 272 U. S. 275, 47 S. Ct. 21, 71 L. Ed. 160.

Judge Cooley, in People v. Harding, 53 Mich. 481, 19 N. W. 155, 156, said that constitutional provisions must be interpreted with reference to "the times and circumstances under which the state constitution was formed—the general spirit of the times and the prevailing sentiments among the people. Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history is liable to be made to express purposes which were never within the minds of the people in agreeing to it." Cf. Okanogan et al. v. United States, 279 U. S. 672, 49 S. Ct. 463, 73 L. Ed. 894, 64 A. L. R. 1434.

At the time section 226 was being considered in the convention that framed the Constitution, an amendment was proposed, forbidding every species of gambling. Volume 1, Debates of Constitutional Convention p. 1172. The delegate who proposed the amendment was asked whether his proposition embraced the prohibition of betting upon the speed of horses, to which he responded that it was his purpose to forbid all species of gambling and all games of chance in every conceivable form. He argued that all gambling was equally wrong, and that it was unfair to denounce gambling in the form of a lottery and to countenance it in other forms, such as betting upon horse races, and the like. The delegate from Lexington argued that it was not the appropriate place to deal with pooling privileges upon race courses, and other forms of gambling, because lotteries theretofore had been licensed by the Legislature, and the object of the pending section was not to deal with any other species of gambling, but to prohibit the Legislature from granting licenses to lotteries. The amendment was rejected, thus indicating that it was the intention of the Convention not to include in section 226 anything but lotteries of the type familiar at the time. The debates of a Constitutional Convention are not conclusive of the meaning of the Constitution, but it is proper to resort to them in order to ascertain the purpose sought to be accomplished by a particular provision where the lan-

guage employed leaves the meaning in doubt. Higgins v. Prater, 91 Ky. 6, 14 S. W. 910, 12 Ky. Law Rep. 645.

"When the inquiry is directed to ascertaining the mischief designed to be remedied, or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument. Where the proceedings clearly point out the purpose of the provision, the aid will be valuable and satisfactory." Cooley, Con. Lim. sec. 66, quoted by Judge Holt in 91 Ky. at page 17, 14 S. W. 910, 912.

The debates by individual members may be equivocal, but the decisions of the Convention itself are authoritative as to what it intended. Hood Rubber Co. v. Commissioner (Mass.) 167 N. E. 670, 70 A. L. R. 1, Annotation page 5; People ex rel. v. Emmerson, 302 Ill. 300, 134 N. E. 707, 21 A. L. R. 636. The General Assembly in March, 1892, enacted the present section 2573, Kentucky Statutes, making it a felony to set up, operate, promote, or to aid, assist, or abet any one in setting up a lottery or gift enterprise. In April, 1893, the General Assembly re-enacted section 1961, exempting from the provisions of section 1960 persons who may sell combination or French pools on any regular race track during the races thereon.

For many years prior to the adoption of our present Constitution laws had existed for the prohibition of all lotteries, except those authorized by the Legislature. Many special acts had been passed to authorize lotteries for various purposes. The Kentucky Digest (volume 3, page 5470) contains a citation of many cases decided by this court upon various phases of the subject. The Constitution was framed to end that practice and to outlaw lotteries, and all schemes of that character. Commonwealth v. Douglas, 100 Ky. 116, 24 S. W. 233, 15 Ky. Law Rep. 581, 66 Am. St. Rep. 328; affirmed by the United States Supreme Court, 168 U. S. 488, 18 S. Ct. 199, 42 L. Ed. 553. The verbiage of section 226 comports with the contemporary construction given thereto. It speaks of "privileges granted," forbids "schemes for similar purposes" and all lottery "privileges or charters heretofore granted are revoked." Lotteries had become an evil of such vast proportions and corrupting influence that nothing less than absolute prohibition of them was deemed adequate.

In Douglas v. Kentucky, 168 U. S. 496, 18 S. Ct. 199, 201, 42 L. Ed. 553, Justice Harlan, speaking for the Supreme Court of the United States, said:

"This court had occasion many years ago to say that the common forms of gambling were comparatively innocuous, when placed in contrast with the widespread pestilence of lotteries; that the former were confined to a few persons and places, while the latter infected the whole community, entered every dwelling, reached every class, preyed upon the hard earnings of the poor, and plundered the ignorant and simple." Phalen v. Va., 8 How. (49 U. S.) 163, 12 L. Ed. 1030; Stone v. Miss., 101 U. S. 814, 25 L. Ed. 1079; Cf. Schroufe v. Com., 141 Ky. 554, 133 S. W. 205.

It did not occur to any one during that period that betting on races, elections, or similar forms of wagering constituted a lottery. Indeed, the contention that betting on horse races by the pari mutuel system constitutes a lottery is of recent origin in this state. For nearly half a century the General Assembly and the Court of Appeals have proceeded upon the general understanding that the whole subject of betting and gaming was within the power of the Legislature to prohibit, regulate, or classify, prohibiting in part and permitting in part, according to its view of the public policy to be enforced. Upon the faith of such legislation and decisions, large investments have been made, and, although the Legislature may radically change the law, without regard to the consequences on a particular business (Clark v. Haberle C. S. B. Co., 280 U. S. 384, 50 S. Ct. 155, 74 L. Ed. 498), it is a doctrine of almost universal acceptance that the courts will not, under such circumstances, overturn a long line of decisions. Commonwealth v. Louisville Gas Co., 135 Ky. 324, 122 S. W. 164; Halter v. Nebraska, 205 U. S. 34, 27 S. Ct. 419, 51 L. Ed. 696, 10 Ann. Cas. 525; New York Life Ins. Co. v. Deer Lodge County, 231 U. S. 495, 34 S. Ct. 167, 58 L. Ed. 332.

It might be fairly argued that the weight of authority is to the effect that lotteries do not embrace betting upon horse races by the pari mutuel system. 17 R. C. L. sec. 16, p. 1230; Reilly v. Gray, 77 Hun. 402, 28 N. Y. S. 811; People v. Fallon, 4 App. Div. 82, 39 N. Y. S. 865, affirmed 152 N. Y. 12, 46 N. E. 296, 37 L. R. A. 227, 57

Am. St. Rep. 492; Utah State Fair Ass'n v. Green, 68 Utah, 251, 249 P. 1016; People v. Reilly, 50 Mich. 384, 15 N. W. 520, 45 Am. Rep. 47.

But, whatever may be the rule in other jurisdictions, we are bound by our own decisions and history upon the subject.

Gaming, betting, and lotteries are separate and distinct things in law and fact, and have been recognized consistently as calling for different treatment and varying penalties. The distinctions are well developed, clearly marked, and in most instances rigidly maintained. Lotteries, 38 C. J. p. 285; 17 R. C. L. p. 1208; and Gaming, 12 R. C. L. p. 704; 27 C. J. p. 961; McDevitt v. Thomas, 130 Ky. 805, 114 S. W. 273; Brand v. Com., 110 Ky. 980, 63 S. W. 31, 23 Ky. Law Rep. 416; Cheek v. Com., 79 Ky. 359; Cheek v. Com., 100 Ky. 1, 37 S. W. 152, 18 Ky. Law Rep. 515; Bentler v. Com., 143 Ky. 509, 136 S. W. 896; Commonwealth v. Jenkins, 159 Ky. 80, 166 S. W. 794, Ann. Cas. 1915B, 170.

That all forms of gambling are evil and characterized by vicious tendencies does not alter the fact of the individuality of each type. We are unable, in the face of the facts recited, to declare that the section of the Constitution condemning lotteries was understood by the people who adopted it as itself outlawing betting upon horse races, by the pari mutuel system, or the other forms of betting. It was then understood, and has been the acepted opinion, that the subjects of betting and gaming were within the absolute control of the police power, possessed by the Legislature. It is the duty and function of the Legislature to discern and correct evils, and evils within that power are not limited to some definite injury to public safety or morals, but embrace the removal of obstacles to a greater public welfare. The power is ample, co-extensive with the duty, and equal to any exigency. Rast v. Van Deman, 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455. Slight reflection will be sufficient to convince the investigator that a different construction adopted now would render inconsistent, if not utterly useless, much of our legislation, and such a conclusion would be impossible to reconcile with numerous decisions of this court. The Legislature possesses the power to prohibit all the multitudinous forms of gambling, which includes the power to regulate, as well as the right to prohibit in

part and regulate in part, provided that all persons in like situations and under the same circumstances and conditions are treated alike.

It is urged that section 3 of the Bill of Rights, which prohibits the grant of exclusive, separate public emoluments or privileges, except in consideration of public services, invalidates section 1961, in that the exemption contained in that section confers a special privilege upon certain persons at a special time and place. By its terms nothing is granted or conferred upon anybody by that section of the statutes. It merely excepts from the operation of section 1960, which comprehensively condemns all the acts therein described, the persons who employ the pari mutuel system of betting on horse races within the inclosures while the races are being run. It amounts to a provision of law that one limited form of betting, under specified conditions and control, is not prohibited. It is a general provision, and applies alike to all persons coming within its purview. 12 C. J. sec. 833, p. 1116. It constitutes a legislative classification, and the only limitation upon the legislative power of classification is that it shall be founded upon some reasonable and actual distinction, and not arbitrarily made. Quong Wing v. Kirkendall, 233 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160. Subject to that limitation, the range of classification is as broad as the knowledge and experience of the lawmakers and as extensive as the theater of human conduct. Grainger v. Douglas Park Jockey Club (C. C. A.) 148 F. 513, 8 Ann. Cas. 997; Jones v. Russell, 224 Ky. 390, 6 S. W. (2d) 460; Commonwealth v. Goldberg, 167 Ky. 96; Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596; Radice v. N. Y., 264 U. S. 292, 44 S. Ct. 325, 68 L. Ed. 690; Owen County Burley Tobacco Society v. Brumback, 128 Ky. 137, 107 S. W. 710, 32 Ky. Law Rep. 916. That the Legislature could find a reasonable ground for putting race track betting in a separate class is plainly possible (State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. [N. S.] 905; 6 R. C. L. sec. 421, page 424; State v. Loomis, 75 Mont. 88, 242 P. 344; Clark v. Hartford Agricultural & Breeders' Ass'n, 118 Md. 608, 85 A. 503; State of Mo. v. James Thompson, 160 Mo. 333, 60 S. W. 1077, 54 L. R. A. 950, 83 Am. St. Rep. 468; Debardelaben v. State, 99 Tenn.

649, 42 S. W. 684; Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474), and it must be assumed that the facts called for it.

"It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328; Rast v. Van Deman, 240 U. S. 342, 36 S. Ct. 370, 374, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455.

The Legislature is the judge of the wisdom and propriety of the classification of subjects of regulation, if there be any basis for it in the essential character or conduct of the things of persons classified. In 27 C. J. 1000, sec. 137, it is said:

"Under some statutes betting upon a horse race is not an indictable offense, if the bet be made at a race course, or other place named in the statute." The author cites in support of the text: Everhart v. People, 54 Colo, 272, 130 P. 1076; Shreveport v. Maloney, 107 La. 193, 31 So. 702; State v. Dycer, 85 Md. 246, 36 A. 763; James v. State, 63 Md. 242; State v. Gemmel, 45 Mont. 210, 122 P. 268; People v. Fallon, 152 N. Y. 1, 46 N. E. 302, 37 L. R. A. 419; Debardelaben v. State, 99 Tenn. 649, 42 S. W. 684; Ransome v. State, 91 Tenn. 716, 20 S. W. 310; State v. Blackburn, 2 Coll. (Tenn.) 235; Huff v. State, 2 Swan (Tenn.) 279; State v. Posey, 1 Hump. (Tenn.) 384.

The cases cited by the commonwealth upon this point are readily distinguishable. In Gordon v. Winchester Building & Accumulating Fund Ass'n, 12 Bush, 110, 23 Am. Rep. 713, and Kentucky Trust Co. v. Lewis, 82 Ky. 579, special corporate charters conferred special privileges, one to charge interest in excess of the legal rate that was open to others under the same circumstances, and the other to sell property held under mortgage without the intervention of a court of equity, as was required in all other foreclosures. Barbour, Sheriff, v. Louisville Board of Trade, 82 Ky. 645; Lancaster v. Clayton, 86 Ky. 373, 5 S. W. 864, 9 Ky. Law Rep. 611; and Commonwealth v. Makibben, 90 Ky. 384, 14 S. W.

372, 12 Ky. Law Rep. 474, 29 Am. St. Rep. 382, each involved an attempted exemption from taxation to which all others in similar situations were subject. In Barker v. Crum, 177 Ky. 637, 198 S. W. 211, 214 L. R. A. 1918F, 673, free tuition was arbitrarily granted to certain students of the Agricultural and Mechanical College for which all other students were charged. In the opinion we find:

> "It is true that the statute in question creates a class, but it does not treat all of that class alike; and its vice is found in that omission. If the statute had provided that all students of a certain age who passed the required examination should be entitled to enter the university upon equal terms and conditions as to the payment of fees and other expenses, it might be said that the statute was unobjectionable."

It is plain that these cases were correctly decided, and that none of them aid in the solution of our present problem.

In Simpson v. Ky. Citizens' B. & L. Ass'n, 101 Ky. 496, 41 S. W. 570, 42 S. W. 834, 19 Ky. Law Rep. 1176, and Safety B. & L. Ass'n v. Ecklar, 106 Ky. 115, 50 S. W. 50, 20 Ky. Law Rep. 1770, general laws were condemned as conferring upon such associations the right to charge a greater rate of interest upon their loans than was permitted to other lenders of money by the general law regulating usury. The decisions proceeded upon the assumption that the classification adopted was arbitrary and unreasonable. The principle was correctly stated that classification was admissible when the law was applied equally to all of a class, and a natural distinction supported the selection of the class. In the light of later experience and a clearer understanding of the character and purpose of building associations, it is now generally held that they may be put in a separate class for the purposes of taxation, regulation, and exemption from general laws. Cf. Mittendorf v. Goodale, 202 Ky. 118, 259 S. W. 59; Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32, 48 S. Ct. 423, 72 L. Ed. 770. The weight of authority now sustains a separate classification and treatment of building and loan associations, 12 C. J. p. 1118. It follows that the exception allowed by section 1961 is not obnoxious to section 3 of the Bill of Rights.

The argument respecting section 51 of the Constitution is that the title to the act now constituting sections 1960 and 1961 of the Kentucky Statutes contains no reference to the exception from section 1960 found in section 1961, and therefore the exemption is invalid. The bill was entitled ''An act concerning gaming.''

Under the Constitution, the subject of an act must be single, though the details thereof may be legion, so long as they are germane to the subject, which is required to be expressed in the title. It is sufficient if the title, although not a complete index of the contents of the act, fairly gives notice of the subject-matter dealt with therein. It is not the form of the legislation, but the subject thereof that must be embraced by the title. Allen v. Cromwell, 203 Ky. 836, 263 S. W. 356; Campbell v. Com., 229 Ky. 264, 17 S. W. (2d) 227, 63 A. L. R. 932; Wiemer v. Commissioner's Sinking Fund of Louisville, 124 Ky. 377, 99 S. W. 242, 30 Ky. Law Rep. 523. The title in this instance was general, and necessarily covered all matters concerning gaming, including that embraced as well as that excluded from the terms of the law. In Eastern Ky. Coal Lands Corp. v. Com., 127 Ky. 667, 106 S. W. 260, 271, 108 S. W. 1138, 32 Ky. Law Rep. 129, 33 Ky. Law Rep. 49, proceedings for the forfeiture of Virginia land grants, and numerous other matters, were held to be within the title of an act ''relating to revenue and taxation.'' Manifestly the title here challenged was sufficient to embrace a delimitation of what was to be included in the broad denunciations of the act.

Section 60 of the Constitution is not applicable, since no general act is repealed by any special or local act, and no city, town, district, or county is exempted from the operation of a general law. A casual examination of the cases decided under that section will demonstrate its inapplicability to the act in question here. Cf. Commonwealth v. Goldburg, 167 Ky. 96, 180 S. W. 68.

Section 59 of the Constitution forbids the Legislature from passing any local or special act ''to regulate the punishment of crimes and misdemeanors, or to remit fines, penalties or forfeitures (subsection 4) or ''in all other cases where a general law can be made applicable (subsection 29).

It is the contention of the commonwealth that the exemption in section 1961 of pari mutuel betting at certain times and places from the operation of section 1960

is a special act interdicted by these provisions. The argument is that the law does not apply to all persons alike and at all places alike. But the very statute that creates the offense provides that it shall not include a certain form of betting under certain circumstances, and that character of legislation is not forbidden. Stone v. Wilson, 39 S. W. 49, 19 Ky. Law Rep. 126; Singleton v. Com., 164 Ky. 243, 175 S. W. 372; Winston v. Stone, 102 Ky. 429, 43 S. W. 397, 19 Ky. Law Rep. 1483; Lakes v. Goodloe, 195 Ky. 240, 242, S. W. 632; Commonwealth v. Starr, 160 Ky. 267, 169 S. W. 743; 12 C. J. sec. 833, p. 1116. In Stratman v. Com., 137 Ky. 500, 125 S. W. 1094, 27 L. R. A. (N. S.) 949, 136 Am. St. Rep. 299, the court condemned as unconstitutional an act forbidding barbering on Sunday. It was deemed special legislation, for the reason that no reasonable basis could be found for singling out that one trade as the sole object of the law. The general law (section 1321) forbidding work on the Sabbath Day contains exceptions. It does not apply to work of charity or necessity, or to persons who observe another day of the week as a Sabbath. Such a classification is reasonable and rests upon a substantial distinction. 12 C. J. p. 1118.

The effect of the contention that the exception of certain cases from its operation brought sections 1960 and 1961, within the condemnation of Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679, would be to invalidate the entire act, not merely the exception. Cf. Felts v. Linton, 217 Ky. 305, 289 S. W. 312. That question, however, could be raised only by a person prosecuted under the act. Cumberland Pipe Line Co. v. Com., 228 Ky. at page 467, 15 S. W. (2d) 280. But neither the state nor the Federal Constitution prevents classification resting upon a distinction having some fair and substantial relation to the object sought to be accomplished by the legislation. Atchison, T. & S. F. R. Co. v. Vosburg, 238 U. S. 56, 35 S. Ct. 675, 59 L. Ed. 119, L. R. A. 1915E, 953; Stratman v. Com., supra. Degrees of evil may afford a sufficient basis for varying treatment by the law. Jones v. Russell, 224 Ky. 397, 6 S. W. (2d) 460.

Certain other cases relied upon by the state may be briefly noticed. Columbia Trust Co. v. Lincoln Institute, 138 Ky. 804, 129 S. W. 113, 29 L. R. A. (N. S.) 53, involved an act which exempted from its terms cities of the first four classes. It also made the establishment of

a charity to depend upon a vote of the people of the precinct where it was proposed to be placed. It was condemned as in violation of two express provisions of the Constitution. Cf. Washington ex rel. v. Roberge, 278 U. S. 116, 48 S. Ct. 50, 73 L. Ed. 210.

City of Louisville v. Kuntz, 104 Ky. 584, 47 S. W. 592, 20 Ky. Law Rep. 805, involved a six-months statute of limitations made especially for Louisville. It was plainly prohibited by subsection 5 of section 59 of the Constitution. It was not a matter that especially concerned the city in any particular justifying classification. Different limitations are provided for different remedies and that is not improper. In James, Auditor, v. Barry, 138 Ky. 656, 128 S. W. 1070, 1072, the validity of an act fixing the salary of a tax assessor was assailed. The court said:

"When the subject-matter is purely one of municipal government, it is clearly competent for the Legislature to classify it alone upon number and density of population, as the Constitution implies if it does not expressly allow. When the subject is one that reasonably depends upon or affects the number and density of population as a correlative fact in the scheme of the particular legislation, then such classification is allowable. There are even perhaps other instances justifying such classification. But where the subject is one of general application throughout the state, and has been so treated in a general scheme of legislation, distinctions favorable or unfavorable to particular localities, and rested alone upon numbers and density of population, are invidious, and therefore offensive to the letter and spirit of the Constitution."

Droege v. McInerney, 120 Ky. 796, 87 S. W. 1085, 27 Ky. Law Rep. 1137, involved the validity of an act concerning elections in counties containing a city of the second class. It made an officer other than the sheriff umpire on the county election board whilst the sheriff performed that function in all other counties. It was held the act violated subsection 20 of section 59 of the Constitution. There was obviously no possible ground for the deviation from the general law. Cf. Felts v. Linton, 217 Ky. 305, 289 S. W. 312.

Enough has been said to demonstrate that the authorities cited by the commonwealth do not support the argument that no reasonable or logical basis existed for the classification by the Legislature of racetrack betting. The difference between betting at a horse race within an inclosure when the races are being run and other forms of betting is palpable. The choice exercised by the General Assembly may have been an unwise one, but its power to make the choice is undoubted. The remedy must be sought where the power resides, and that is with the General Assembly of the state. The Constitution contains no provision to prevent the Legislature from dealing with the subject in its own way and according to its own view of public policy. The courts are not authorized to usurp the powers conferred upon another branch of the government, and, when the Legislature finds that the facts warrant a classification, and it has relation to the purpose of the law, is supported by a reasonable distinction, and operates uniformly upon all within the class, the legislation is valid. Billings v. Illinois, 188 U. S. 97, 23 S. Ct. 272, 47 L. Ed. 400; Tanner v. Little, 240 U. S. 369, 36 S. Ct. 379, 60 L. Ed. 691; St. John v. N. Y., 201 U. S. 633, 26 S. Ct. 554, 50 L. Ed. 896, 5 Ann. Cas. 909; Atchison, T. & S. F. Co. v. Matthews, 174 U. S. 96, 19 S. Ct. 609, 43 L. Ed. 909; Patsone v. Penn., 232 U. S. 138, 33 S. Ct. 281, 58 L. Ed. 539; Halter v. Nebraska, 205 U. S. 34, 27 S. Ct. 419, 51 L. Ed. 696, 10 Ann. Cas. 525.

The General Assembly need not make its regulations all-comprehensive, and it is not required to extend them to every possible case within their reach; but, in dealing with practical exigencies, it may be guided by experience. Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F. 829; Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Dominion Hotel v. Arizona, 249 U. S. 265, 39 S. Ct. 273, 63 L. Ed. 597.

All that is required in such cases is that the law shall operate alike upon all persons and property similarly situated, and be effective everywhere like circumstances and conditions may be found. Maxwell v. Bugbee, 250 U. S. 525, 40 S. Ct. 2, 63 L. Ed. 1124; Walston v. Nevin, 128 U. S. 578, 9 S. Ct. 192, 32 L. Ed. 544; Southern R. Co. v. Greene, 216 U. S. 400, 30 S. Ct. 287, 54 L. Ed. 536, 17 Ann. Cas. 1247; German Alliance Ins. Co. v. Hale, 219

U. S. 307, 31 S. Ct. 246, 55 L. Ed. 229; Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923; Buck v. Bell, 274 U. S. 200, 47 S. Ct. 584, 71 L. Ed. 1000.

Coming to consider the state of the law on the concrete question now under consideration, we find that text-writers and courts without exception acknowledge the right and power of the Legislature to exempt from the operation of statutes designed to suppress gaming designated places on described occasions, as will be seen from the text. 27 C. J. 1004, sec. 151, and following ones, and in 12 R. C. L. 724, sec. 24, and following ones. The general statements on the subject as contained in the first reference are:

"In a number of jurisdictions the statutes either prohibit gaming in particular places, or on the other hand, provide that persons gaming at a particular place, such as a private residence, shall be exempted from prosecution under the statutes against gaming. . . . In some jurisdictions there are statutes prohibiting playing or betting in: Houses or places where spirituous or intoxicating liquors are retailed, sold, or given away; taverns, inns, hotels, or restaurants; 'outhouses where people resort,' gaming houses; highways; pool rooms, and race fields. Gaming in a public place, place of public resort, or public house, is also frequently prohibited."

The text in the latter reference (R. C. L.) states the principle in this language:

"To convict one of the crime of gaming it is often necessary to show that the playing or betting occurred at some particular place, gaming at which is expressly prohibited by statute. This is because in many jurisdictions the statutes particularly enumerate the places at which gaming is illegal, thereby at least impliedly exempting from criminality playing or betting at all other places."

Both are sustained by opinions from a number of courts, and which the reader may obtain by a reference thereto.

Likewise Mr. Freeman in an extended note to the case of State v. Mathis, 121 Am. St. Rep. 687, under the general title "Gambling Games and Devices," freely

recognizes the right of the Legislature, in enacting such *malum prohibita* offenses, to exempt from punishment the denounced acts when engaged in at designated places and times pointed out in the statute, and in the same volume of R. C. L. supra, on page 718, sec. 17, it is pointed out that horse racing is a game, and that betting thereon comes within the purview of a statute against gaming generally, unless excluded expressly or by clear implication. No court holds that such exemptions, whether in a gaming or other penal statute, and when they penalize all persons similarly situated and their exemptions likewise apply to all persons similarly situated, violate in the least degree constitutional provisions such as are contained in section 3 of our Bill of Right saying: "And no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services." Such conclusion is reached because that constitutional provision was never intended to apply to universal exceptions as above described, and which is of the character here involved, since the exempting statute in this case (section 1961 of our Statutes) embraces, not alone the operators of race tracks; not alone the owners of the horses that run the race; not alone the jockeys who ride them, nor any other person or class of persons, but *all* "persons who sell combination or French pools on any regular race track during the races thereon." Any one and every one residing either in or out of the state who so engages at such places during the specified times is exempt from the operation of the statute.

Neither does the fact that such exemption applies to only one device by which gambling is done under the general terms of the statute in section 1960 affect the validity of the exemption, since the truism that "the whole includes all of its parts" is thoroughly established and applied in the law as well as in the sciences. But in the notes to the text of Corpus Juris, supra, will be found cases where the exemption embraced only gaming by specified means, notwithstanding the general statute was leveled at gaming engaged in, by and through all means whatsoever, or by or through a number of named ones, in which case it is as competent to exempt gaming by one of the means at designated places and times as much as it is to exempt it if done by all of them at such places and times.

Analogous to the offense of gaming could be named a number of penal offenses in this jurisdiction, chief among which is the one denouncing drunkenness in certain places, and which this court has upheld in a number of opinions in which we said that it was not unlawful to be drunk at any of the places not designated in the statute. A number of other instances of an analogous nature could be cited, but what has been said is, according to the opinions of all members of the court, except JUDGE RICHARDSON, sufficient to show that the exemption contained in section 1961, supra, of our statute, was not beyond the power of the Legislature to enact; and whether or not it was proper or wise to do so is a question exclusively for its determination: there being no authority in the courts to do so after the power of the Legislature to so enact is established.

The court concludes that sections 1960 and 1961, Kentucky Statutes, are not in violation of any of the provisions of the Constitution mentioned.

Thus far the judges agree, except Judge RICHARDSON.

It is his view an incorrect interpretation is given to section 1960, and the proviso in section 1961 and sections 51 and 59 of the Constitution and their application to these sections. The constitutionality of the proviso in section 1961, is here presented for the first time. In the cases of Grinstead v. Kirby, 110 S. W. 247, 33 Ky. Law Rep. 287; Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474; State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S. W. 681, 25 L. R. A. (N. S.) 905; Jones v. Russell, 224 Ky. 390, 6 S. W. (2d) 460; Commonwealth v. Starr, 160 Ky. 260, 169 S. W. 743, the constitutionality of this proviso was not raised by the pleadings, discussed in the opinions, nor determined by the court. The court, passing its constitutionality, assumed that it was constitutional, and proceeded to discuss its operation and purpose.

The General Assembly may grant to classes of persons, or to professions, businesses, or occupations, exemptions from the operation of the general law. It may classify banks, building and loan associations, physicians and surgeons, attorneys at law, insurance, or persons engaged in games within race-track inclosures or in houses, and other subjects. It may exempt persons from jury service, from working on public roads, or requiring

registration as a qualification for voting, or labor unions from anti-trust statutes, or farmers peddling crops raised by them on property under their control; define and create public offenses, such as public drunkenness, or engaging in games whereby money may be bet, won, or lost, or the offense of setting up and operating, managing, and controlling gambling devices, with or without compensation, whereat money may be bet, won, or lost, or other offenses.

But such enactments granting such exemptions, or making such classifications, to conform to the Constitution of the state, must be enacted under appropriate titles, and not grant a special or exclusive privilege to any one or more of the class to which the same may be assigned as a class by the general law. The exemption must be allowed to all persons similarly situated and under like circumstances. To illustrate: The general law creating and defining the offense of public drunkenness cannot embrace a proviso that the general law shall not apply to persons intoxicated on "drug-store liquor;" or a general law prohibiting ordinary gaming, whereat money may be bet, won, or lost, cannot carry a proviso that it shall not apply to persons engaged in games of poker. Lakes v. Goodloe, 195 Ky. 242, 242 S. W. 632; King v. Com., 194 Ky. 143, 238 S. W. 373, 22 A. L. R. 535; 25 R. C. L. sec. 65, page 813; 12 C. J. sec. 873; page 1141; Singleton v. Com., 164 Ky. 243, 175 S. W. 372; Freund on Police Powers, sec. 26, page 21; Peonage Cases (D. C.) 123 F. 671; In re Langford (C. C.) 57 F. 570; Horwich v. Walker-Gordon Lab. Co., 205 Ill. 497, 68 N. E. 938, 98 Am. St. Rep. 254; Cooley's Const. Lim. (8th Ed.) vol. 2; Holden v. James, 11 Mass. 396, 6 Am. Dec. 174; Bull v. Conroe, 13 Wis. 233.

The General Assembly undertook to suspend the gneral law of limitations in certain cases by providing that in such cases the period of limitation should be six months. It endeavored to suspend the general law which fixed the rate of interest at six per cent., by an enactment wherein it was provided that a certain business should have a right to collect a higher rate of interest than six per cent. It passed an act fixing the jurisdiction of county courts differently in different counties. It provided for the collection of a license fee from persons engaged in certain occupations and fixed the license rate differently in different cities. By another act it authorized the selection of two pupils from each of the 120

counties and conferred on them certain privileges while attending the Agricultural and Mechanical College at Lexington. The effect of these acts was to take out of the classes to which the subjects had been assigned by the general law, and exempt a particular certain one of a class to which the general law had assigned it. It was held by this court that these acts were invalid. Gordon v. Winchester, 12 Bush. 110, 23 Am. Rep. 713; Henderson, etc., v. Johnson, 88 Ky. 197, 10 S. W. 787, 10 Ky. Law Rep. 830, 3 L. R. A. 289; Simpson v. B. & L. Ass'n. 101 Ky. 496, 41 S. W. 570, 42 S. W. 834, 19 Ky. Law Rep. 1176; Lynn v. Bullock, 189 Ky. 604, 225 S. W. 733; Stratman v. Com., 137 Ky. 500, 125 S. W. 1094, 27 L. R. A. (N. S.) 949, 136 Am. St. Rep. 299; City of Louisville v. Kuntz, 104 Ky. 584, 47 S. W. 592, 20 Ky. Law Rep. 805; Gorley v. City, 104 Ky. 372, 47 S. W. 263, 20 Ky. Law Rep. 602; City of Louisville v. Seibert, 51 S. W. 310, 21 Ky. Law Rep. 328; Barker v. Crum, 177 Ky. 637, 198 S. W. 211, L. R. A. 1918F, 673; Hager v. Walker, 128 Ky. 1, 107 S. W. 254, 32 Ky. Law Rep. 748, 15 L. R. A. (N. S.) 195, 129 Am. St. Rep. 238.

Section 1960 groups together certain gambling contrivances, having certain qualities and characteristics in common, distinguishing them, by reason thereof, from other gambling devices, and prescribes a penalty for setting up and operating the same. In the case of Commonwealth v. Simonds, 79 Ky. 618, combination or French pools was one of the contrivances declared by this court to be embraced by this section. Standing alone, section 1960 is a general criminal statute classifying or grouping together the gambling devices comprehended by it. The effect of the proviso in section 1961 is to take out of this group or class of gambling contrivances and exempt it or those who engage in setting up and operating combination or French pools from the operation of section 1960. Whether the proviso be regarded as exempting from the statute one only gambling device embraced by it, or the persons who operate it, from its operation, in either event, it is a suspension of the general criminal law to such one contrivance or such persons who set up and operate it, and this constitutes as to either of them, or both, special class legislation.

For the same reason that the General Assembly was without constitutional authority to exempt one or more

of a class from the operation of the general law prescribing the rate of interest and statute of limitation, and other subjects, in the cases supra, it was without constitutional authority to exempt such one only gambling device, or the persons who set up and operate it. The General Assembly, under appropriate title, may classify race-track inclosures and all persons thereon during the running of the regular races. State v. Rose, 40 Mont. 70, 105 P. 82; Bebardelaben v. State, 99 Tenn. 649, 42 S. W. 684. The sections of the Montana and Tennessee statutes exempt all persons within the race-track inclosure from the operation of the act of which they were respectively a part. The statutes involved in those cases make "two classes of betting or wagering persons—those within and those without the inclosure, the former are exempt, and the latter liable."

The General Assembly recognized this principle when it enacted section 3914b-6, and the provision in section 1328a, wherein it is provided:

"The provisions of the act shall not apply to [race horse track] inclosures during regular race meetings or such inclosures wherein horse racing is being conducted," etc.

The proviso in section 1961 is not similar or alike, either in phraseology or in scope or meaning, to the Tennessee and Montana statutes, nor sections 3914b—6 and 1328a, supra. It is not susceptible to the interpretation or the application given by the courts to the statutes involved in the Montana and Tennessee cases.

To be included in the exempted classes of section 1961, the act of setting up and operating of combination or French pools is a prerequisite. State v. Cooley, 56 Mont. 540. The express language of the proviso selects a few persons from the multitude on the race track and awards to them a special privilege not afforded by law to all other persons or the multitude of persons thereat, but denies to them the immunity so granted to the few. Thus the proviso divides the persons on race tracks during regular races thereon into two classes of persons on the race track: (a) Persons setting up and operating combination or French pools; (b) persons not engaged in so doing, and gives immunity to the one and denies it to the other, without regard to whether such other persons may or may not engage in setting up and operating

one or more of the other games or contrivances. If those not present during the regular races thereon be regarded, such constitutes a division of all persons into three classes instead of two classes as above indicated. If it exempted all persons within the race-track inclosure during the running of regular races thereon from the provisions of the act, it might be regarded as a classification of persons on or within race-track inclosures.

The immunity is offered, not because such persons are within the race-track inclosure, or engaged in the business of breeding and growing blooded horses, or in racing such horses, but because they sell combination of French pools. This constitutes a statutory, discriminatory classification of persons, if not one only of a gambling contrivance.

The title of the act of which section 1960 and 1961 are a part is in this language, "An act relating to gambling." To interpret it as creating and defining a classification of persons or business or professions, or a race-track inclosure or persons within such inclosure is unauthorized by the plain, simple language, found in the proviso. The classification of a business or a profession, or of persons engaged in a business or profession, not within itself illegal or vicious, cannot be constitutionally enacted under a title, "An Act to regulate gambling." The Legislature was without constitutional authority to classify a business, a profession, or an occupation, whether that of doctor, lawyer, merchant, or person engaged in breeding and growing blooded horses, or in racing horses on race tracks or race-track inclosures, under such title, for neither of them in its nature is of kith or akin to the subject of the title.

It is a general rule, which has been repeatedly and often announced and followed by this court, that the title to each constitutional enactment must be fairly expressive of the contents of the act, and has to be read in connection with it in determining the meaning of the act. Commonwealth v. Barney, 115 Ky. 475, 74 S. W. 181, 24 Ky. Law Rep. 2352; Joyce v. Woods, 78 Ky. 386; Duke v. Boyd County, 225 Ky. 112, 7 S. W. (2d) 839.

No person reading the title, "An act to regulate gambling," could have the opinion that any provision thereof accorded a prerogative, or afforded protection to persons engaged in breeding, raising, and growing

blooded horses, or owning, controlling, or operating a race track, or engaged in racing thereon. The title does not cover either of these subjects in a general way or at all, and, in so far as the body of the act relates to either of these subjects, the title is misleading, because in reading it the reader would not be conveyed the idea that the body of the act relates to any of these subject-matters. Neither of them is germane to the subject mentioned in the title. It points out specifically the nature of the legislation it is proposed to enact, and, if the proviso in section 1961 be interpreted to include any of these subject-matters, it goes beyond the title, and deals with substantial subjects or things outside of those specifically presented in the title.

Illustrative cases supporting this insistence and in which this court has held acts invalid because the title was defective in the respects indicated are: Henderson Bridge Co. v. Alves, 122 Ky. 46, 90 S. W. 995, 28 Ky. Law Rep. 994; Wiemer v. Commssioner's Sinking Fund of Louisville, 124 Ky. 377, 99 S. W. 242, 30 Ky. Law Rep. 523; Board of Trustees v. Tate, 155 Ky. 296, 159 S. W. 777; Thompson v. Com., 159 Ky. 8, 166 S. W. 623; Burton v. Monticello & Burnside Turnpike Co., 162 Ky. 787, 173 S. W. 144; Exall v. Holland, 166 Ky. 315, 179 S. W. 241; Bosworth, Auditor, v. State University, 166 Ky. 436, 179 S. W. 403, L. R. A. 1917B, 808; Houston v. Boltz, Judge, 169 Ky. 640, 185 S. W. 76; Ogden v. Cronan, Sheriff, 171 Ky. 254, 188 S. W. 357; South v. Fish, 181 Ky. 349, 205 S. W. 329; Wood v. Com., 225 Ky. 294, 8 S. W. (2d) 428; City of Owensboro v. Hazel, 229 Ky. 752, 17 S. W. (2d) 1031. The last pronouncement of this court interpreting section 51 of the Constitution is Wood v. Com., 225 Ky. 294, 8 S. W. (2d) 428.

Applying these principles to the interpretation of the title "An Act relating to gambling," and giving due respect to section 51 of the Constitution, the title cannot be interpreted to include the subject-mater of breeding, growing, or raising blooded horses, or owning or operating a race track, or as affording a privilege to those attending or present at or engaged on race tracks during regular races thereon.

The proviso in section 1961 is invalid for the reasons hereinbefore stated. The act of which section 1961 is a part is complete within itself, excluding the proviso; the declaring of the proviso invalid on the ground that it is

within the inhibitions of the State Constitution, the remainder of the act remains in force. Black's Const. Laws, sec. 43, p. 75; Cooley's Const. Lim. (8th Ed.) vol. 2, 809, 810; State Insurance Board v. Greene, 185 Ky. 196, 213 S. W. 218; Sinking Fund Com'rs v. George, 104 Ky. 260, 47 S. W. 779, 20 Ky. Law Rep. 938, 84 Am. St. Rep. 454; Thompson v. Com., 159 Ky. 8, 166 S. W. 623. Such are the reasons for Judge Richardson not concurring with the majority upon the constitutional questions. mentioned.

The commonwealth sought injunctive relief upon two grounds. One of them was the use of the pari mutuel machine for the purpose of betting, but, since we have held such betting to be authorized by valid statutes, we need only to consider on this branch of the case whether injunctive relief may be awarded on the other allegations of the petition. The prayer of the petition was for an injunction against maintaining a nuisance by the operation of a pari mutuel system of betting, and the defendants be enjoined from intimidating, coercing or attempting to influence their employees to vote for or against any candidate in any primary or general election, and that the defendants be enjoined from contributing to the campaign expenses, and from aiding and assisting any candidate for office. A court of equity will not grant an injunction to prevent a violation of criminal or penal statutes not involving the use of property, or the breach of contracts, or the maintenance of a public nuisance. The statute itself is a standing injunction against a violation of its provisions, and it is not within the province of a court of equity to restrain criminal acts not concerned with contracts or the use of property for illegal purposes. Erlanger Kennel Club v. Daugherty, 213 Ky. 648, 281 S. W. 826; Respass v. Com., 131 Ky. 807, 115 S. W. 1131, 21 L. R. A. (N. S.) 836; Commonwealth v. Ruh, 173 Ky. 771, 191 S. W. 498, L. R. A. 1917D, 283; Commonwealth v. McGovern, 116 Ky. 212, 75 S. W. 261, 25 Ky. Law Rep. 411, 66 L. R. A. 280. Cf. City of Louisville v. Louisville Home Tel. Co., 149 Ky. 234, 148 S. W. 13, Ann. Cas. 1914A, 1240.

In some cases injunctions or other equitable remedies have been authorized by statute (see section 2554a-13, Kentucky Statutes; Clark v. Com., 204 Ky. 740, 265 S. W. 280; also section 3941m-11, Ky. Stats.), but such statutes afford no aid in this instance.

The Supreme Court of the United States in Re Debs, 158 U. S. 564, at page 593, 15 S. Ct. 900, 909, 39 L. Ed. 1092, said:

"A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature; but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

It is apparent, therefore, that the allegations of the petition do not warrant the issuance of an injunction to restrain acts which would constitute a violation of the act to prevent corrupt practices, or participation by corporations in primary or general elections. Ky. Stats. secs. 1574a-1 to 1574a-3. But the conclusion announced would not preclude the court in formulating a judgment in a quo warranto proceeding from including, if deemed proper, an injunction affecting future conduct.

■ We pass now to the second ground upon which a forfeiture of the charters of the appellees was sought; namely, that they had committed offenses against the statutes of the state designed to prevent and to punish corrupt lobbying and pernicious political activities.

Since the charter of the Kentucky Jockey Club was voluntarily surrendered in January, 1928, and before the filing of this suit, of course the commonwealth does not expect by this action to obtain a forfeiture of that particular charter, but, inasmuch as it contends that, although no forfeiture can be decreed, yet in quo warranto proceedings a substantial fine may be imposed along with, or in lieu of, a decree of forfeiture of charter, a question to be presently discussed, it becomes necessary to determine whether the charter of the Kentucky Jockey Club, had it not been surrendered, could have been forfeited on the allegations in the petition if established by proof.

In so far as the ground for forfeiture now under discussion is based on pernicious political activities, Chief Justice Logan and Judges Clay, Dietzman, and Rees are of this opinion: The acts charged in the peti-

tion are those embraced and denounced in section 150 of the Constitution and sections 1574a-1, 1574a-2, 1574a-3, 1565b-1 and 1565b-2 of the Statutes, the latter being commonly called the Corrupt Practice Acts. By the express terms of that section of the Constitution and of the statutes themselves, it is provided that, on conviction for any of the offenses embraced therein, the corporation shall, in addition to the payment of the fines imposed by statute, forfeit its charter. Such being the case, these judges are of the opinion that, before a forfeiture can be based on any of these offenses, there must first be obtained in a criminal proceeding a judgment of conviction for their commission. In the case of Commonwealth v. Hearon, 235 Ky. 681, 32 S. W. (2d) 21, the commonwealth was proceeding under section 480 of the Civil Code of Practice to forfeit the office of Hearon as member of the county board of education of Webster county because, as the petition alleged, he had on divers and sundry occasions ridden on the Illinois Central Railroad on a free pass, in violation of section 197 of the Constitution providing that a public officer who accepts and uses a free pass shall forfeit his office, and in violation of section 201c-1 et seq., of the Kentucky Statutes, providing that the use of a free pass is a misdemeanor, on conviction for which the public officer shall, in addition to specific penalties, forfeit his office. It was held the commonwealth could not, in the absence of a conviction for the offense or series of offenses set out in the petition, forfeit the office of Hearon. A like result was reached in Sweeney v. Coulter, 109 Ky. 295, 58 S. W. 784, 22 Ky. Law Rep. 885, where only the constitutional provision above mentioned was involved, and which does not expressly require a conviction in order to forfeit the office.

In the instant case, not only the statutes but also the Constitution itself requires as a condition precedent to the forfeiture of the charter that the corporation be convicted of the specified offense or offenses. In the Hearon Case, it was held that there could be no forfeiture of office in the absence of a conviction, and the Coulter Case likewise so held, even though the constitutional provision there involved did not specifically call for a conviction as a condition precedent. Under the authority of these cases, the judges named are clearly of the opinion that this ground cannot avail the commonwealth, in the absence of a conviction, and, as such is not alleged in

the petition, such ground cannot be relied upon. Judges Richardson, Thomas, and Willis, however, are of the opinion that the provisions of particular penal statutes passed pursuant to a mandate of the Constitution do not exclude the remedy by a proceeding in the nature of a quo warranto or condition its applicability upon a conviction which is required before a forfeiture in a prosecution under the statute. The remedy now invoked proceeds also from a constitutional mandate. Section 205. The civil remedy is thought to be an additional and available means of enforcing the public policy of the commonwealth, and it is entitled at its election to pursue both remedies. State v. Capital City Dairy Co., 62 Ohio St. 350, 57 N. E. 62, 57 L. R. A. 181, affirmed 183 U. S. 238, 22 S. Ct. 120, 46 L. Ed. 171; State v. Nebraska Distilling Co., 29 Neb. 700, 46 N. W. 155; State v. Gamble-Robinson Co., 44 N. D. 376, 176 N. W. 103, 9 A. L. R. 98; State v. Delmar Jockey Club, 200 Mo. 34, 92 S. W. 185, 98 S. W. 539; Com. of Pa. v. American Baseball Club, 290 Pa. 136, 138 A. 497, 53 A. L. R. 1027; State v. Standard Oil Co., 218 Mo. 1, 116 S. W. 902, affirmed 224 U. S. 270, 32 S. Ct. 406, 56 L. Ed. 760, Ann Cas. 1913D, 936; Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079; Com. ex rel. Schaffer v. Wilkins, 271 Pa. 523, 115 A. 887, 19 A. L. R. 1379.

Conforming to the great weight of authority, this court said in Commonwealth v. Newport, L. & A. Turnpike, 97 S. W. 375, 376, 29 Ky. Law Rep. 1285:

"We do not mean to be understood as holding that under no circumstances would such acts of misuse of its charter privileges by appellee as are charged in the petition not justify a forfeiture of its charter, for they might be purposely continued and willfully persisted in under circumstances of such aggravation as to result or threaten irreparable injury to the public, which could not be remedied or prevented by the ordinary penalties that may be inflicted for such acts of wrongdoing by the courts of criminal jurisdiction."

No implication curtailing the power of the commonwealth to invoke appropriate remedies should be indulged. 32 Cyc. 1417; People v. Londoner, 13 Colo. 303, 22 P. 764, 6 L. R. A. 444. Several remedies to redress wrongs to the public should be regarded as

cumulative. And, even if the forfeiture should be denied by the court on that sole ground, the violation of those statutes could be considered in connection with other grounds justifying the application of the remedy. The opposite construction maintained by the majority tends to nullify section 205 of the Constitution, which requires the General Assembly, by general laws, to provide for the revocation or forfeiture of the charters of all corporations guilty of abuse or misuse of its franchises, or when such corporations become detrimental to the interest and welfare of the commonwealth or its citizens. This section of the Constitution is consistent with the authorities mentioned, in that no previous conviction is necessary, and must mean that the civil remedy was not affected by the policy declared respecting criminal proceedings. Such is the opinion of the minority judges named.

Coming now to that part of ground 2 designated as "corrupt lobbying," Chief Justice Logan and Judges Clay, Dietzman, and Rees are of opinion that the allegations in the petition as amended are insufficient though established by proof to work a forfeiture of the charters of the Latonia Jockey Club and of Churchill Downs. These allegations are:

"Plaintiff avers that shortly after the incorporation of the defendant, Kentucky Jockey Club, and the selection of its officers, agents and employees, there commenced an agitation for the repeal of the exemption in section 1961 of the Kentucky Statutes.

"And afterwards various bills were introduced in the General Assembly at each session providing for a repeal of said law and the defendants, and each of them, in order to defeat these bills, employed various and sundry persons to attend each and every session of the General Assembly and, either directly or indirectly, furnished to these lobbyists and agents large sums in cash for the purpose of debauching and controlling any and all members of the General Assembly which it could by such practices, influence to vote against the repeal of the said law."

It will be remembered that the petition as amended was filed on March 29, 1929. The Kentucky Jockey Club was dissolved in January, 1928, and Churchill Downs and the Latonia Jockey Club, according to the allegations of

the petition, then came into being. The courts judicially know that the only session of the General Assembly held since the dissolution of the Kentucky Jockey Club was that of 1928, and it was about a third over when that club was dissolved. Hence, so far as the Latonia Club and Churchill Downs are concerned, they simply could not have attended any session other than the 1928 session, although the commonwealth alleges they attended every one since the incorporation of the Kentucky Jockey Club. A reading of the allegations above quoted discloses that it is not alleged that any of the lobbyists and agents alleged to have been employed by any of the appellees debauched or controlled any member of the General Assembly by the use of the money alleged to have been furnished them or otherwise, or that any such agent or employee even attempted at any time to debauch or control any member of the Assembly by the use of such money, or otherwise, or that any such lobbyist or agent even attended any session of the General Assembly. Even if the fundamental rule of pleading that a pleading must be construed most strongly against the pleader be ignored, a liberal construction of these allegations amounts to nothing more than that the Clubs entertained an intention to corruptly lobby, but never carried that intention into action. On these allegations, Judges Clay and Dietzman are of the opinion that nothing is alleged against any of the appellees warranting a forfeiture, since intention without some action is not to be so punished. Chief Justice Logan and Rees agree with Judges Clay and Dietzman in so far as the Latonia Jockey Club and Churchill Downs are concerned, since there was no persistent course of conduct on their part extending over a series of General Assemblies, and the petition does not allege that either of these clubs intended to continue any illegal practice alleged to have been committed by the Kentucky Jockey Club. It is true the petition does allege that the two new clubs intended to carry on the business that the Kentucky Jockey Club had been doing, but this allegation was made in connection with the allegation of the petition bearing on the pari mutuel betting, and plainly had reference only to that. Thereafter in the petition, whenever the commonwealth alleged anything it conceived to be an illegal practice, it specifically charged each defendant with that practice, thus indicating that it did not regard the general allegation about carrying on the business as covering anything

other than the pari mutuel betting. But, in so far as the Kentucky Jockey Club is concerned, Chief Justice Logan and Rees are of the opinion that enough is alleged to show such a continuing and persistent intention on its part to corrupt the General Assembly as to warrant a forfeiture of its charter had it not been surrendered.

Judges Richardson, Thomas, and Willis are of the opinion that the allegations are sufficient to forfeit the charter of all three appellees because the dissolution of the charter of the parent company and the creation of new corporations to continue the same business in the same manner, with the same property, for the same purposes, and for the benefit of the same persons, should not affect the case at all. Rather it should constitute a confession that the original position of the Kentucky Jockey Club could not be defended. They are of the opinion that the case should be tried as if the new expedient had not been resorted to by the defendants. The right of the commonwealth to inquire into the character of past conduct, or to invoke the power of the court to visit appropriate restrictions upon future action, should not be defeated or forestalled by any subterfuge or manipulation of the property and franchises of the corporations. The action to forfeit the charters and franchises should not be defeated or delayed by a mere dissolution of one corporation so long as the challenged conduct is continued. The liability of the creature corporations is not limited merely to assets received, but they are subject to such remedy as the court may adopt to stop the alleged illegal business. Skirvin Operating Co. v. Southwestern Electric Co., 71 Okl. 25, 174 P. 1069, 15 A. L. R. 1106, annotation page 1148.

It is not to punish the new corporation for the acts of the old one, but to reclaim the misused franchise entirely, or to restrain its future use within proper bounds in the hands of its owners. If a fine should be adjudged, as it might be as an incident to any relief granted, the creature corporations are liable for its payment. Skirvin Operating Co. v. Southwestern Electric Co., 71 Okl. 25, 174 P. 1069, 15 A. L. R. 1106. The corporate charter is one thing; the right to engage in business is another. And, so long as the managers of the business persist in carrying it on, the power of the commonwealth should be ample to restrain it within legal limits. The criminal remedies may be sufficient as

punishment, but the civil remedy to prevent a continuance of acts detrimental to the public interest should not be denied.

We come now to ground 3 relied upon for a forfeiture; namely, that these companies had commited acts and engaged in transactions not prohibited or punished by any particular statute, but detrimental to the public welfare, and violative of the implied and express contracts upon which the continuance of the corporate franchises were conditioned and which constituted an abuse and misuse of powers. All the judges agree that these allegations are insufficient.

As to some of the allegations under this head, the petition itself shows that they could not be true of the Latonia Jockey Club and Churchill Downs, as, for instance, the charge that they had sold some of their stock on credit when it had already been alleged that they had transferred their entire capital stock to the American Turf Association, a Delaware corporation, in consideration of the Kentucky Jockey Club turning over to them its assets in Kenton and Jefferson counties, respectively. Nor, indeed, is the sale of the stock on credit a violation of the statutes or Constitution. It is expressly permitted by section 543 of the Statutes. In the event of insolvency, the creditors would, under the decisions of this court, clearly have the right to require the unpaid portion of the subscriptions paid in, and so no right of theirs would be affected by a sale on credit. The allegations that the companies purposed establishing a monopoly of the race-track business are not sufficient. They are such allegations as are thus dealt with in Mattingly v. Brents, 155 Ky. 570, 159 S. W. 1157, 1160:

"Equally without merit do we regard the claim set up in the answer of the appellant Brown that the object, with which appellee leased the livery stable in controversy was to secure a monopoly of the livery business. In the form alleged, this allegation is a mere conclusion of the pleader. It does not allege that the acquisition of this stable by appellee would in fact give him the control of the livery business in the city of Lebanon or that it would result in his unreasonably increasing the charges for livery service or would put him in a position to do so."

There is nothing in the allegations about the issuance of free passes by these companies or their efforts to

obtain favorable publicity for their business in the newspapers warranting a forfeiture. The companies, if they so desired, had a right to issue free passes. If such issuance trenched upon any violation of the Corrupt Practice Act, what has heretofore been said in connection with those offenses is applicable. Equally is that true of the allegations concerning the organization of appellee's employees into publicity committees during political campaigns. As to the allegations of investment by the appellees of their capital and surplus in stock of other corporations, there being no allegations that such is not authorized by the charters of the company, they are not sufficient to raise any question of illegality. However, Judges Richardson, Thomas, and Willis are of the opinion that the petition on the whole alleges enough to withstand a demurrer. Pleadings in quo warranto are anomalous. Bouvier Law Dict. vol. 3, p. 2788. A complaint must allege sufficient facts to show a perversion, misuse, or abuse of the corporate powers. 5 Thompson on Corporations (2d Ed.), sec. 5810.

This court in Commonwealth v. Newport, etc., Turnpike Co., 97 S. W. 375, 29 Ky. Law Rep. 1285, held that the remedy of quo warranto should not be invoked when other sufficient remedies to correct the evils complained of had not been utilized, unless allegations were made to the effect that the misconduct was willful and repeated. The opinion quoted 10 Am. & Eng. Enc. of Law, 1279, to the effect that the information must state with precision every fact which constitutes the abuse of the franchises on which he demand for a forfeiture is predicated.

In 32 Cyc. 1448, it is said that such facts should be alleged as will make out a prima facie case for relief, and they should be alleged in traversable form, avoiding mere conclusions of law. But it is only necessary to set forth in general terms the wrongful acts or omissions complained of, and the ultimate facts may be alleged. Tested by these rules, the minority judges named regard the petition in this case as sufficient to support the inquiry, since it sets forth numerous acts not authorized by the charter, and habitual conduct detrimental to the public interest. It does not, in so many words, allege that the statutory penalties would be insufficient, or that the wrongful acts were willful and repeated. But it does allege a general course of conduct so described in the petition as to constitute such an abuse, misuse, and perversion of its powers and privileges and such a violation

of statutes as necessarily implied a continuous disregard of its duties and conduct calculated to result in public inquiry. Cf. State v. Capital City Dairy Co., 62 Ohio St. 350, 57 N. E. 62, 57 L. R. A. 181.

The defendants themselves first thought the petition was sufficient to require an answer since they filed one. If it had been deemed necessary to have the allegations amplified, that could have been done by the court upon its own motion or upon the motion of the defendants. Civil Code of Practice, secs. 113, 114.

Standing alone, with its averments admitted, the three judges mentioned are of opinion that the petition makes out a prima facie case on a sufficient number of grounds to require a defense by all the defendants.

Since a majority of the court are of the opinion that, although no grounds are alleged upon which a forfeiture of the charters of the Latonia Jockey Club and Churchill Downs may be had, sufficient is alleged in the petition upon which to base a forfeiture of the charter of the Kentucky Jockey Club if established by proof had the Kentucky Jockey Club not been dissolved voluntarily as it was, it becomes necessary to decide whether a fine can yet be imposed upon the Kentucky Jockey Club because of the acts alleged which would, if established by proof, have warranted a forfeiture of its charter, and, if so, may that fine be substantial in amount, what is its character, is it barred by limitations, and are the Latonia Jockey Club and Churchill Downs liable for it?

The right of the commonwealth to bring a civil action to forfeit the charter of a corporation exists by virtue of Kentucky Statutes, sec. 569, and Civil Code of Practice, sec. 480.. The latter section reads:

> "In lieu of the writs of scire facias and quo warranto, or of an information in the nature of a quo warranto, ordinary actions may be brought to vacate or repeal charters, and to prevent the usurpation of an office or franchise."

This provision substituting an ordinary action to forfeit a charter for the old method of procedure first appeared in the Code of 1854 as section 529. Before 1854 the writ of quo warranto was well known in Kentucky law. The first Code enacted in 1851 expressly provided that it should not affect the laws regulating pro-

ceedings in quo warranto. Section 664, subsection 10, Acts of 1850-51, pp. 203, 204. Both the writ of quo warranto and a writ of scire facias were part of Kentucky law before 1854, having come to us with the law of England. Taylor v. Commonwealth, 3 J. J. Marsh, 401; Commonwealth v. Lexington & Harrodsburg Turnpike Road Co., 6 B. Mon. 397. See West Publishing Company, Kentucky Digest, volume 4, title "Scire Facias."

The three writs mentioned in section 480 of the Civil Code of Practice and their functions at common law are explained in a note appearing in Cook on Corporations (6th Ed.) sec. 333, substantially as follows: The writ of quo warranto is an ancient writ employed by the king against any one who claims or usurps an office or franchise, or who, having had a right to the franchise, neglects to exercise it to inquire by what warrant he still claims to exercise it. The writ being dilatory and technical, it soon fell into disuse, and in its place grew up the information in the nature of a quo warranto. This proceeding was in its nature and in form a criminal proceeding, and by it the Attorney General proceeded on a twofold ground, both to punish the usurper and to prevent the unlawful exercise of its franchise. Scire facias was resorted to where there was no original defect in the charter as if a grant obtained by fraud. It may be used also in the case where the charter was valid but the powers of a corporation have been abused. The distinction taken in England is thus: That a scire facias may be resorted to where a legal corporation, in full possession of its powers, abuses them while a quo warranto is applicable where a corporation from the defect in its Constitution becomes an imperfect body, but nevertheless continues to act as a corporation. The birth of the writ of quo warranto is buried in legal antiquity. It grew out of the necessities of the king to repossess a grant of franchise, sometimes because of misuse of the grant, but often again to replenish a depleted treasury. Rex v. London, 3 Hard, State Trials, 545: In the action, the burden rested on the respondent to establish the source of the grant, and this in the early history of England, because of the lapse of time and the unsettled condition of the government, became very hard to do, and forfeitures were sustained because the right could not be established. This served the purpose of grasping monarchs. To correct the abuses and to afford a fair hearing, the Statutes of Gloucester, 6 Edw. 1, 1278, were

adopted. By them the right of trial before justices of the circuit was insured, and franchises resting on prescription were declared valid. The judgments of the justices in these actions were conclusive on the crown. 2 Coke Inst. 498. As stated, the information in the nature of quo warranto soon displaced the writ of quo warranto. This new writ in its inception not only provided for a forfeiture but also a fine in the discretion of the justices trying the cause. In an action of this character and in the writ of scire facias, the burden was not placed on the respondent to establish the grant. By the Statute of Anne, 9 Anne c. 20, passed in 1702, an information in the nature of quo warranto was for the first time permitted to be brought at the relation of a private person, and by section 5 of that act the court was authorized to enter judgment of ouster and fine. As this statute was passed almost 100 years after 4 James 1, it was, of course, never law in Kentucky. Commonwealth v. Lexington & Harrodsburg Turnpike Co., supra. But it is argued that the statute furnishes strong confirmation of the conclusion that at common law the right to a substantial fine went with the information in the nature of quo warranto; that the statute was not meant to increase the penalty over that allowed upon an information filed by the Attorney General whose right to proceed by information was not abolished but continued side by side with the new right granted the private relator. However, it is clear that by the time of Blackstone the fine had become nominal in amount, for in 3 Blackstone's Commentaries, p. 263, it is said of and concerning an information in the nature of quo warranto:

> "This is properly a criminal method of prosecution as well to punish the usurper by a fine for the usurpation of the franchise as to oust him and seize it for the Crown; both hath long been applied to the mere purposes of trying the civil right, seizing the franchise or ousting the wrongful possessor, *the fine being nominal only.*" (Italics ours.)

As is well known, the Commentaries of Blackstone, the first volume of the first authorized edition of which appeared in 1765, the work being completed within the course of the next four years, had a most profound influence on the legal education and the legal thought of the lawyers of this country of that day and for many years thereafter, for the circulation of his Commentaries on

the American continent was as great as in England itself, if not greater. Whatever may have been the correct historical statement of the nature and extent of the fine of the common-law writ of an information in the nature of quo warranto, the influence of Blackstone upon the early legal thought of this country undoubtedly prevailed to the extent that the fine came to be regarded generally in American jurisprudence as being only nominal in amount and inflicted for the misdemeanor involved. Thus in Fletcher's "Cyclopedia of the Law of Private Corporations," vol. 5, sec. 3271, p. 5038, it is said:

> "The references to the subject both in opinions and textbooks are few and casual. Usually Blackstone's statement that the writ is now used for the trying of the civil right, 'the fine being nominal only,' is repeated, and the general practice, as well as some American authorities, would seem to indicate that only a nominal fine can be imposed. In other states, however, the rulings are to the effect that a substantial fine may be imposed."

And in the case of Standard Oil Co. v. Missouri, 224 U. S. 270, 32 S. Ct. 406, 410, 56 L. Ed. 760, Ann. Cas. 1913D, 936, the Supreme Court, in upholding a substantial fine imposed by the state of Missouri in a quo warranto proceeding because no federal question was involved in the appeal, took occasion to say:

> "But there are practically no decisions which deal with the nature and amount of the fine which can be entered in states where, as in Missouri, quo warranto is treated as a purely civil proceeding. The references to the subject, both in text books and opinions, are few and casual. They usually repeat Blackstone's statement (3 Com. 262) that the writ is now used for trying the civil right, 'the fine being nominal only.' Ames v. Kansas, 111 U. S. 470, 28 L. Ed. 490, 4 S. Ct. 437; Com. v. Woelper, 3 Serg. & R. (Pa.) 53; High, Extr. Legal Rem. 702, 697, 593. These authorities and the general practice indicate that in most of the American states only a nominal fine can be imposed in civil quo warranto proceedings."

In 22 R. C. L. 719, we find:

> "The fine, however, fell to a nominal amount, and the proceeding became in almost all cases a civil

one for the purpose of trying the right to a franchise or office.''

And in 32 Cyc. 1414, it is said:

"But long before the American Revolution it lost its character as a criminal proceeding in everything except form and was applied to the mere process of trying the civil right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal merely; and such has always been its character in many states of the Union.''

It must be conceded, however, that in some states the view as above outlined did not and does not prevail, notably Missouri, and that in them the fine which may be imposed may be substantial in amount.

What is the situation in Kentucky? As to that, the court is not in entire accord. No case in this state prior to the adoption of section 480 in the Civil Code of Practice, or, as a matter of fact, since that time, has been found touching on the question whether a fine of any kind, substantial or otherwise, can be imposed in connection with a judgment of forfeiture of a charter in a quo warranto proceeding or in one brought under section 480 of the Civil Code of Practice. Of the court, Chief Justice LOGAN and Judge REES are of the opinion that, by section 480 of the Code creating the civil proceeding therein provided for, in lieu of the writs of scire facias, quo warranto, and information in the nature of quo warranto, the drafters of the Code intended that the forfeiture of the charter attendant upon the success of the commonwealth in such a proceeding should carry with it only those consequences then generally known, recognized, and understood as such consequences, and that as at that time it was generally thought in American jurisprudence that only a nominal fine could be imposed, none other can be. Judges CLAY and DIETZMAN are of the opinion that, whatever may be the right construction to put upon section 480 of the Civil Code of Practice clearly by the act of 1870 dealing with the incorporation of companies, their powers, privileges and duties, the Legislature intended to do away entirely with the feature of a fine, as a part of the judgment in a proceeding brought to forfeit a charter. By section 10 of the Act of March 15, 1870, being chapter 729 of the Acts of 1869-70, and found on page 96, intentional fraud

in failing or refusing to comply substantially with the articles of incorporation or in deceiving the public or individuals in relation to the assets and liabilities of a corporation is denounced, and by section 11 diversion of the funds of the corporation to other objects than that specified in the articles of incorporation and the payment of dividends unearned are denounced. By section 12 of that act it is provided:

> "Either such failure or the practice of fraud in the manner hereinbefore mentioned shall be cause of forfeiture of all the privileges hereby conferred, and any court of competent jurisdiction may upon the application of the attorney for the Commonwealth by proceeding in the nature of a quo warranto declare such forfeiture and close up the affairs of the company."

That section is now replaced by section 569 of the Statutes, a part of chapter 35 of the Acts of 1894, which reads:

> "Whenever any corporation has failed, or shall fail, to perform or comply with any requirement or provision of its charter under which it does business in this State, or shall be guilty of an abuse or misuse of its corporate powers, privileges, or franchises, or shall become detrimental to the interest and welfare of the Commonwealth or its citizens, it shall be the duty of the Attorney General of the State to institute such proceedings as may be proper and necessary to have forfeited and revoked the charter, powers, franchises and privileges of such corporation."

To Judges CLAY and DIETZMAN it seems clear that the Legislature by these acts intended to indicate the character of judgment to be entered when charters are forfeited for misuse or abuse of corporate powers, that by them it was intended to supplant whatever judgment might have been entered at common law, and that, as no fine was provided in either of them, no fine can now be imposed as a part of the judgment of ouster.

By its silence as to a fine in defining the character of judgment to be entered in a suit brought to forfeit a charter for an abuse or misuse of corporate powers, the Legislature, in the judgment of Judges CLAY and DIETZMAN, clearly intended to eliminate the matter of a

fine. Judges RICHARDSON, THOMAS, and WILLIS are of the opinion that a substantial fine may still be imposed; their reasons being that, in a proceeding in the nature of a quo warranto, the court has a broad discretion as to the character and extent of relief to be granted. In 32 Cyc. 1434, it is said the judgment may be one of ouster of corporate franchises or as to particular powers. If the corporation is dissolved, the court may prohibit, by an injunction or other appropriate order, the continuance of the condemned business, and a fine may be imposed. Where the usurpation is not willful, the amount of the fine is generally nominal. But that also is in the discretion of the court. In 5 Thompson on Corporations, sec. 5824, it is said that the judgment may be one of ouster and dissolution which is equivalent to a judgment of seizure at common law. Gardner v. State, 77 Kan. 742, 95 P. 588; Reed v. Cumberland, etc., Canal Co., 65 Me. 132; People v. R. R. Co., 15 Wend (N. Y.) 113, 30 Am. Dec. 33; State v. Village of Bradford, 32 Vt. 50. A judgment of ouster is proper, even though the wrongful acts have been discontinued before the trial. Hammer v. State, 44 N. J. Law 667. The judgment may be a general ouster or a limited one with a fine accompanying it, or it may be simple fine if that is deemed sufficient. 14a C. J. p. 1140; 22 R. C. L. secs 45-47; State v. Fireman's Fund Ins. Co., 152 Mo. 1, 52 S. W. 595, 45 L. R. A. 363; State v. Armour Packing Co., 173 Mo. 356, 73 S. W. 645, 61 L. R. A. 464, 96 Am. St. Rep. 515; Weston v. Lane, 40 Kan. 479, 20 P. 260, 10 Am. St. Rep. 224; State v. Omaha & C. Bridge Co., 91 Iowa, 517, 60 N. W. 121.

The fine in many cases is merely nominal, but that does not indicate that the power of the court is so circumscribed. It means merely to describe the practice, and there can be no reason for imposing a nominal fine unless it is designed to vindicate and preserve the power of the court to make the fine substantial, if deemed necessary to serve its purpose of prevention of a continuance of the wrong. The power of the court, in rendering a judgment, is equal to the exigency, and the judgment may be formulated in such terms as to accomplish a correction of the evil. The only limitation upon the power of the court is that imposed by the Constitution against unreasonable and excessive punishments. Standard Oil Co. v. Missouri, 224 U. S. 287, 32 S. Ct. 406, 56 L. Ed. 760, Ann. Cas. 1913D, 936; State of Ohio v. Capital City Dairy Co., 62 Ohio St. 350, 57 N. E. 62, 57

L. R. A. 181. In State v. Armour .Packing Co., supra, the court cited a number of authorities to sustain the proposition that the character of the judgment rests in the sound discretion of the court. There a fine of $5,000 and costs was imposed, coupled with an injunction against doing business in the state, unless the fine and costs were paid within a specified period. The fine is a civil penalty to prevent the wrong, and is an incident of the remedy by quo warranto. In the opinion of the three judges mentioned, the courts of Kentucky possess the same power that inheres in the remedy as applied by the courts of other states, and is limited only by the considerations that control judicial discretion and by the provisions of the state and Federal Constitutions. Standard Oil Co. v. Missouri, supra, 224 U. S. 270, 32 S. Ct. 406, 56 L. Ed. 760, Ann. Cas. 1913D, page 936.

It is not necessary to discuss whether the fine is a pure punishment, damages for breach of implied and express contract, restitution of ill-gotten gains, or merely a preventive remedy deemed sufficient to correct the wrongful conduct. The formulation of a judgment suitable to the case is what is meant by leaving the matter to the discretion of the Court.

To sum up on this branch of the opinion, three of the members of the court are of the opinion that a substantial fine may be imposed, two that only a nominal fine may be imposed, and two that none at all can be imposed as a part of a judgment in a suit brought to forfeit a charter.

All the judges are agreed that at least under the allegation in the petition as amended, admitted by the demurrer, to the effect that among the other alleged purposes the Kentucky Jockey Club had, in order to defeat the collection of any money judgment which might be obtained against it in this action, transferred all its assets to the Latonia Jockey Club and Churchill Downs, the latter two companies are liable to the extent, at least of the assets received by them for any such money judgment.

Since a majority of the court are of the opinion that some fine may be imposed, it becomes necessary to discuss whether such a fine is criminal or penal in its nature, and therefore barred by the one-year statute of limitations (Kentucky Statutes, sec. 1138), or civil in its nature and therefore not barred at least under five years (section 2515). If the one-year statute applies, the judg-

ment will have to be affirmed, as the petition fails to allege the acts complained of occurred within the year preceding the filing of the petition, a necessary allegation in a penal action. If the fine be civil in its nature, limitations must be pleaded as a defense, and cannot be taken advantage of by demurrer to the petition.

As to the nature of the fine, Chief Justice LOGAN and Judges REES, RICHARDSON, THOMAS, and WILLIS are of the opinion that the fine imposed is civil in its character, and hence is not governed or controlled by the one-year statute of limitations. The proceeding is now regarded as civil, whatever may have been its character at one time. In Thompson on Corporations (2d Ed.) vol. 5, sec. 5796, the rule is so stated and supported by a vast array of authorities.

In Ames v. Kansas, 111 U. S. 449, 4 S. Ct. 437, 28 L. Ed. 482, and Foster v. Kansas, 112 U. S. 201, 5 S. Ct. 8, 97, 28 L. Ed. 629, the Supreme Court of the United States gave much consideration to the subject, and concluded that it was a civil action. Again in Standard Oil Co. v. Missouri, supra, and in Newman v. U. S., 238 U. S. 537, 35 S. Ct. 881, 59 L. Ed. 1446, the same conclusion was reached. See, also, 22 R. C. L., sec. 2, page 657 and Cyc. 1414.

Indeed, the Civil Code of Practice, sec. 480, expressly provides for an ordinary action in lieu of the writs of scire facias and quo warranto and of an information in the nature of a quo warranto. Cf. Kirch v. City of Louisville, 125 Ky. 391, 101 S. W. 373, 30 Ky. Law Rep. 1356; Stack v. Com., 118 Ky. 481, 81 S. W. 917, 26 Ky. Law Rep. 343; Commonwealth v. Adams, 3 Metc. 7. These authorities leave no room for doubt that the ordinary action in lieu of an information in the nature of a quo warranto provides a civil remedy, which is unaffected by the character of the judgment that may be pronounced. The nature of the judgment does not determine the character of the action. It is the character of the action that determines the nature and scope of the judgment. However, Judges CLAY and DIETZMAN are of the opinion that at common law the fine in its inception was undoubtedly penal in its nature, being, as the books say, imposed for the misdemeanor involved, and that at least where, as here, there can be no forfeiture of the charter because the charter had been voluntarily surrendered but only the imposition of a fine nominal or substantial it is penal in its nature, and hence controlled by the one-

year statute of limitations. That the fine may be collected in a civil proceeding does not in their judgment render it any the less penal in its nature, for by the Code itself penal actions (admittedly criminal in their nature) are civil proceedings. Hence the nature of the proceeding does not necessarily determine the nature of the fine which is imposed in the proceeding. These two judges are unable to agree with the position taken by the Missouri court in the Standard Oil Company case, supra, and the commonwealth in this suit, to the effect the fine imposed is not really a fine, but damages for the breach of contract; that is, a breach of an implied undertaking by the corporation not to misuse or abuse its corporate powers. It is true that the Supreme Court of the United States affirmed the Missouri court in the Standard Oil Company case, which was decided by the Missouri court on that theory, but the Supreme Court did so on the ground that, under Missouri law, as determined by the Missouri courts, punitive damages can be recovered for the breach of an ordinary contract. The Supreme Court, however, was careful to point out that, by the overwhelming preponderance of authority, nowhere in the law, save in cases for the breach of a contract of marriage, are punitive damages allowed for breaches of contract. Nor, in the opinion of Judges CLAY and DIETZMAN, can the fine be assimilated to compensatory damages. There is no measure for such damages. Certainly, in their judgment, it could not be by way of any gain the corporation may have made because the fine may be imposed whether the corporation has gained or not; certainly not by any damage the commonwealth may have sustained because the commonwealth can recover without any showing of damages, or, if that be assumed, without showing its extent or character. In short, as Judges CLAY and DIETZMAN view it, where the sole purpose left in the lawsuit is the imposition of a fine, it is simply the imposition of a penalty, the amount of which is left to the discretion of the judge, and that therefore the one-year statute of limitations as provided in section 1138 of the Statutes applies.

All the judges of the court are agreed that a case will not be reversed to enable a party to recover nominal damages only. Elder v. Florsheim Shoe Co., 209 Ky. 509, 273 S. W. 60; Vansant v. Ashland Waterworks Co., 200 Ky. 586, 255 S. W. 132; Stone v. Adams Express Co.

(Ky.) 122 S. W. 200. Therefore, as CHIEF JUSTICE LOGAN and Judge REES think that the allegation of the petition, even if established, would entitle the commonwealth to nominal damages only and as Judges CLAY and DIETZMAN think that no fine can be imposed, it follows that the judgment must be affirmed.

The conclusions of the court, and the views of the individual judges, may be summarized as follows:

(1) All of the judges concur that betting on horse races by the pari mutuel system does not constitute a lottery within the meaning of section 226 of the Constitution.

(2) All of the judges, except Judge RICHARDSON, agree that sections 1960 and 1961 of the Kentucky Statutes do not violate sections 3, 51, 59, or 60 of the state Constitution. Judge RICHARDSON is of the opinion that they do violate sections 3, 51, and 59.

(3) All of the judges agree that injunctive relief may not be granted to prevent the violation of penal statutes not concerned with contracts or the use of property for the creation of a public nuisance.

(4) A majority of the court is of the opinion that the charters of the defendant corporations could not be forfeited for the alleged violation of section 150 of the Constitution, or of the statutes passed pursuant thereto, because a conviction for the offenses thereby created is a condition prerequisite to a forfeiture thereunder. Judges RICHARDSON, THOMAS and WILLIS are of the opinion that the remedy in the nature of a quo warranto is additional and cumulative, and not conditioned upon prior prosecution or conviction.

(5) A majority of the court is of the opinion that the allegations of the pleading are insufficient to make out a case of corrupt lobbying except as to the Kentucky Jockey Club alone. But Judges RICHARDSON, THOMAS, and WILLIS are of the opinion that the allegation in connection with the other allegations of the petition are sufficient to withstand a demurrer.

(6) All of the judges are agreed that the allegations of the petition are not sufficient to show any corrupt or unlawful practice respecting the issuance of stock on credit, or the manner of advertising adopted and certain other allegations mentioned in the opinion. But, apart from these matters, Judges RICHARDSON,

790

Thomas, and Willis are of the opinion that the petition on the whole states a cause of action which, if established, would entitle the commonwealth to relief.

(7) The majority of the court is of the opinion that a proceeding in the matter of quo warranto is a civil action authorized by the Civil Code of Practice, sec. 480, and Kentucky Statutes, sec. 569. Judges Clay and Dietzman are of the opinion that, whatever the nature of the action, it is penal in so far as it seeks to recover a substantial sum of money, and embraced by section 1138 of the Kentucky Statutes, which provides a limitation of one year on penal prosecutions.

(8) A majority of the court is of the opinion that no substantial fine may be imposed in a quo warranto proceeding to forfeit the charters of corporations. Judges Clay and Dietzman are of the opinion that no fine may be imposed, whilst Chief Justice Logan and Judge Rees are of the opinion that only a nominal fine may be imposed. Judges Richardson, Thomas, and Willis are of the opinion that a judgment in quo warranto rests in the sound discretion of the court, and that a substantial fine may be included therein, although the action is purely civil, and the fact that a substantial fine may be included in the relief granted does not convert the character of the action so as to bring section 1138 of the Kentucky Statutes into operation on the remedy.

(9) All of the judges agree that a case cannot be reversed for the imposition of only a nominal fine.

The judgment is affirmed.

Whole court sitting.